

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-9-2007

# Silva-Rengifo v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 04-4302

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Silva-Rengifo v. Atty Gen USA" (2007). *2007 Decisions.* Paper 1707.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1707

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos: 04-4302, 05-3423
_____

CARLOS SILVA-RENGIFO,

Petitioner

v.

ATTORNEY GENERAL
OF THE UNITED STATES; UNITED STATES
DEPARTMENT OF HOMELAND SECURITY

Respondents
_____

Consolidated Petitions for Review Of a Final Order of
Removal
From the Board of Immigration Appeals
(A18 103 088)
_____

Argued September 27, 2006

Before: McKEE and AMBRO, <u>Circuit Judges</u>, and
RESTANI,* <u>Judge</u>

_____

(Opinion filed: January 9, 2007)
_____

*Honorable Jane A. Restani, Chief Judge of the United States
Court of International Trade, sitting by designation.

ALEXANDER E. EISEMANN, ESQ. (Argued)
188 Spring Street,
South Salem, NY 10590
Attorney for Petitioner


JONATHAN POTTER, ESQ. (Argued)
DOUGLAS E. GINSBURG, ESQ.
MARK S. DES NOYER, ESQ.
WILLIAM C. PEACHEY, ESQ.
U.S. Department of Justice
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
Attorneys for Respondent

---

OPINION

---

McKEE, Circuit Judge.

Carlos Silva-Rengifo petitions for review of an *en banc* decision of the Board of Immigration Appeals denying his motion to reopen. The government did not initially oppose that motion. However, after the Board granted permission to reopen, the government petitioned for *en banc* review by the entire Board. The BIA's *en banc* decision reversed the decision to allow Silva-Rengifo to reopen his motion. The *en banc* Board held that Silva-Rengifo had not established a *prima facie* case for relief under the United Nations Convention Against Torture

and Other Cruel, Inhuman or Degrading Treatment or Punishment (the "Convention" or the "CAT") because he had not shown governmental acquiescence in the torturous conduct. For the reasons that follow, we will reverse the BIA's *en banc* decision and remand to the BIA for further proceedings consistent with this opinion.

## I.  FACTUAL AND PROCEDURAL HISTORY

Silva-Rengifo, a 47-year-old husband and father of three, entered the United States as a lawful permanent resident in 1968 when he was only 11 years old, and he has lived here continuously for the past 38 years.  In 1990, he was convicted of possession of cocaine with intent to distribute in state court in New Jersey, for which he was sentenced to a period of incarceration of three and one-half years.

As a result of that conviction, removal proceedings began against him in June 1991.  In 1993, after a full hearing, an Immigration Judge found him removable and denied his application for section 212(c) hardship relief.[1]  The IJ

---

[1] Discretionary withholding of removal under former 8 U.S.C. § 1182(c) (1994) is known as "section 212(c) relief." Relief in the form of a waiver of inadmissibility under this section of the Act was eliminated by the Illegal Immigration

considered the equities that Silva-Rengifo presented, but concluded that the equities and the evidence of family hardship that would be caused by removal did not justify relief under section 212(c). Silva-Rengifo appealed the IJ's decision to the BIA. The BIA rejected his appeal in December 1993. Although the BIA held that Silva-Rengifo was removable in 1993, the INS took no steps to remove him for several years. Seven years later, on November 29, 2000, the INS issued a Form I-166, or "bag-and-baggage" letter (requiring aliens with final removal orders to report for deportation by a specified date) implementing the BIA's 1993 decision.

On July 26, 2001, Silva-Rengifo was arrested on a warrant that issued after he failed to appear in response to the Bag and Baggage letter.[2] Almost immediately thereafter, on July 31, 2001, he filed a motion with the BIA asking it to reopen or reconsider the 1993 decision so that he could produce evidence that would establish his eligibility for relief under the

Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-54C (1996). *But see INS v. St. Cyr*, 533 U.S. 289, 326 (2001).

[2] There is a dispute about whether Silva-Rengifo received that letter and whether it was properly mailed to him.

CAT. He argued that, due to changed country conditions since the IJ's 1993 decision, he would face an unacceptable risk of death or serious injury if removed to Colombia. The record before the Board included documentary evidence of the changed country conditions, including evidence of human rights abuses and extrajudicial killings carried out by the government, kidnapings by paramilitary and guerilla forces, and cooperation or collusion between such groups and the government.[3]

The BIA granted the motion to reopen in part, and denied it in part. The Board relied on *St. Cyr*, 533 U.S. 289 (2001) to deny reopening Silva-Rengifo's section 212(c) application to present additional evidence of his rehabilitation during the seven years since the initial BIA decision. However, the Board granted the request for consideration of relief under the CAT. The Board explained:

> He also wishes the hearing to be reopened so that he can

---

[3] Silva-Rengifo also attached proof that he barely spoke Spanish, had no contacts in Colombia, and that his entire family, including his wife and children, all resided in the United States. This evidence was included to support reconsideration of his request for 212(c) relief by the Board and his claim that he should be allowed to present additional evidence of further rehabilitation since the IJ's 1993 rejection of his request for equitable relief under § 212(c).

apply for asylum and withholding of deportation to Colombia . . . . [He] is barred . . . from filing an asylum or CAT application unless he can show changed circumstances in his country of nationality or extraordinary circumstances relating to the delay.

* * *

The respondent has demonstrated changed circumstances in his country of nationality. The background information demonstrates a significant deterioration in society since his hearing. His claim that he belongs to a persecuted social group of foreign nationals or those perceived to be foreign nationals is supported by the reports submitted with this motion. Therefore, we find he has made a prima facie case of a well-founded fear of persecution to qualify for asylum. However, there is little evidence that the government acquiesces in torture; this issue should be developed at the hearing regarding whether he has not demonstrated a (*sic*) eligibility for relief under the Convention Against Torture. *See Matter of S-V-*, Interim Decision 3430 (BIA 2000).

App. at 50. The Board thereafter entered an order granting Silva-Rengifo's motion to reopen, and remanded the appeal to the IJ for further proceedings consistent with its opinion.

The government responded to the BIA's partial grant of relief by petitioning for *en banc* reconsideration of the BIA's order. As summarized in the BIA's *en banc* decision, the Department of Homeland Security ("DHS") argued that Silva-Rengifo's application for relief was untimely, and that he had not "set forth a *prima facie* case for eligibility under the CAT

6

since he did not show that he was more likely than not to face torture by those acting with the consent or acquiescence of public officials." (citing 8 C.F.R. §§ 1208.18(a)(1),(7)).

The *en banc* Board rejected DHS's claim that Silva-Rengifo's motion to reopen was untimely, stating: "We stand by our previous finding that the respondent can demonstrate changed country conditions as a basis for justifying the late filing of his application for relief." App. at 38. (BIA *en banc* Decision 2004). However, the *en banc* Board nevertheless held that allowing Silva-Rengifo to reopen was error because he had not established that the Colombian government acquiesces to torture. The Board explained:

> The respondent, however, did not provide evidence of his *prima facie* eligibility for relief under the Convention Against Torture because he failed to show that any harm that might befall him in Colombia would be meted out by the government or by those acting with the consent or actual acquiescence of the government. 8 C.F.R. §§ 1208.18(a)(1), (7). Protection under the Convention Against Torture does not extend to those who are harmed by groups that the government is unable to control. *See Matter of S-V-*, 22 I&N Dec. 1306 (BIA 2000).

App. at 38 (BIA *en banc* Decision 2004) (emphasis added). The Board concluded that "because the record contain[ed] little evidence that the [Colombian] government acquiesces in torture

7

of those perceived to be foreign, the respondent has failed to demonstrate *prima facie* eligibility for relief under the Convention Against Torture, and, therefore, the motion to reopen should have been denied." Id. at 38-39 (internal quotation marks omitted).

Silva-Rengifo then filed the instant petition for review of the *en banc* decision. He also filed for habeas corpus relief in the United States District Court for the District of New Jersey. He raised the following five claims for relief in his petition for review: (1) the government had waived any challenge to his *prima facie* case by failing to initially oppose his motion to reopen; (2) the BIA erred in concluding that he had not established a *prima facie* case; (3) he was wrongly precluded from introducing additional evidence of his rehabilitation and seeking reconsideration of the BIA's 1993 decision; (4) the INS was precluded from enforcing the initial order of removal because of laches and/or equitable estoppel; and (5) his underlying conviction should not be considered an "aggravated felony" for immigration purposes.

Pursuant to a motion by the government, Silva-Rengifo's habeas petition was transferred from the district court to this

8

court under the REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 231 (2005) (the "REAL ID Act"). His original petition for review is consolidated with the habeas petition which we must treat as a petition for review, and both are now before us. *Kamara v. Att'y Gen.,* 420 F.3d 202, 210 (3d Cir. 2005).

## II. JURISDICTION AND STANDARD OF REVIEW

### A. Jurisdiction

Under the REAL ID Act, a petition for review is now the exclusive means of judicial review of all orders of removal except those issued pursuant to 8 U.S.C. §1225(b)(1). *See* 8 U.S.C. § 1252(a)(5) (2005). Moreover, all habeas corpus petitions filed by aliens seeking relief from removal that were pending in the district courts on the date the REAL ID Act became effective (May 11, 2005) were converted to petitions for review and transferred to the appropriate court of appeals. *See* 8 U.S.C. § 1252(a)(5); *see also Hernandez v. Gonzales*, 437 F.3d 341, 344 (3d Cir. 2006).[4]

---

[4] Cases so transferred are not subject to the thirty-day filing deadline in section 242(b)(1) of the Immigration and Nationality Act. REAL ID Act § 106(c); 8 U.S.C. § 1252(a)(5); *see also Kamara,* 420 F.3d at 210.

Accordingly, we now have before us two petitions for review. The first is the petition for review that Silva-Rengifo filed in this court seeking review of the BIA's *en banc* denial of his motion to reopen. As noted, there, the *en banc* Board denied the motion based upon its conclusion that he had not demonstrated *prima facie* eligibility for relief under the CAT. The second is the converted habeas petition that Silva-Rengifo originally filed in the district court, challenging the constitutionality of the removal proceedings.

## B. STANDARD OF REVIEW

Although Silva-Rengifo's habeas corpus petition has now been converted to a petition for review, our standard of review remains the same. "A review for 'constitutional claims or questions of law,' as described in § 106(a)(1)(A)(iii) of the REAL ID Act, 8 U.S.C. § 1252(a)(2)(D), mirrors our previously enunciated standard of review over an alien's habeas petition." *Kamara*, 420 F.3d at 210-11. Thus, we review Silva-Rengifo's constitutional and legal questions *de novo*, *id.,* but defer to the BIA's reasonable interpretations of statutes it is charged with administering. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999); *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,

10

467 U.S. 837, 842-43 (1984).

The same standard applies to Silva-Rengifo's petition for review under the REAL ID Act. Prior to enactment of the REAL ID Act, we would not have had jurisdiction to review Silva-Rengifo's claim because an alien who was removable because of a conviction for an aggravated felony was statutorily barred from petitioning a court of appeals for review of the BIA's finding that he was ineligible for CAT relief. *See* 8 U.S.C. § 1252(a)(2)(c). However, the REAL ID Act eliminated that barrier as to "constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals." *See* 8 U.S.C. § 1252(a)(2)(D); *see also Kamara*, 420 F.3d at 211 (noting that REAL ID Act's jurisdictional grant regarding appeals by aggravated felons extends not just to legal determinations but also to application of law to facts). Accordingly, we also afford *de novo* review to the BIA's *en banc* decision.

## III. DISCUSSION

As noted above, the *en banc* BIA reversed the order allowing Silva-Rengifo to reopen his case "because he failed to show that any harm that might befall him in Colombia would be

11

meted out by the government or by those acting with the consent or actual acquiescence of the government." App. at 38. (Citing 8 C.F.R. §§ 1208.18(a)(1),(7), and its earlier decision in *Matter of S-V-*, 22 I&N Dec. 1306 (BIA 2000)). Although Silva-Rengifo raises four other issues in his petitions for review, inasmuch as we will vacate the *en banc* decision based upon its erroneous interpretation of the requirement for governmental "acquiescence" under the CAT, we need not rule on his remaining claims. Rather, we will dismiss them without prejudice to Silva-Rengifo's ability to raise those arguments on remand to the Board.[5]

## A. The Convention Against Torture

The United States signed the Convention Against Torture on April 18, 1988, and the Senate ratified it on October 27, 1990. 136 Cong. Rec. S17, 486-501 (daily ed. Oct. 27, 1990). It became binding on the United States in November of 1991,

---

[5] As noted above, the BIA stated that it was reversing its prior ruling because the record contained "little evidence that the Colombian government acquiesces in torture of those perceived to be foreign," and because Silva-Rengifo had therefore "failed to demonstrate a *prima facie* eligibility for relief under the Convention . . . ." Both explanations turn on the meaning of "acquiescence" in the CAT.

12

after President Clinton delivered the ratifying documents to the United Nations. U.N. Doc. 571 Leg/SER.E/13.IV.9 (1995); Convention, art. 27(2). The Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") initiated the implementation of the Convention. Pub. L. No. 105-277, div. G., tit. XXII, § 2242, 112 Stat. 2681-822 (codified at 8 U.S.C. § 1231 note). That provision provides in part that "[n]o state [shall] . . . expel, return ('refouler') or extradite a person to another state where there are substantial grounds for believing that he would be in danger of being subjected to torture." *Id*. Accordingly, it became "the policy of the United States not to expel . . . or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture . . . ." *Id*.; *see also Li v. Ashcroft,* 312 F.3d 1094, 1103 (9th Cir. 2002).

"An applicant for relief on the merits under [Article 3 of] the Convention Against Torture bears the burden of establishing 'that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.'" *Sevoian v. Ashcroft*, 290 F.3d 166, 174-175 (3d Cir. 2002) (quoting 8

13

C.F.R. § 208.16(c)(2)). "The United States Senate specified this standard, as well as many of the other standards that govern relief under the Convention, in the several 'understandings' that it imposed on the United States' ratification of the Convention Against Torture." *Id*. at 175 (citations omitted). Unlike with asylum or withholding of removal, an alien seeking relief under the CAT need not establish that he/she is a "refugee" and therefore need not establish that torture is inflicted "on account of" any protected status. *See Amanfi v. Ashcroft,* 328 F.3d. 719, 725 (3d Cir. 2003) ("A petition for protection under the Convention Against Torture differs significantly from petitions for asylum or withholding of removal because the alien need not demonstrate that he will be tortured on account of a particular belief or immutable characteristic."). Rather, he/she must establish a likelihood of being subjected to torturous acts inflicted "by or at the instigation of or with the consent or *acquiescence* of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1) (2006) (emphasis added).

"Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness

14

of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7). If an alien produces sufficient evidence to satisfy that burden, withholding of removal or deferring of removal is mandatory. 8 C.F.R. §§ 1208.16 - .18. However, as shall become clear from our discussion, the alien need not establish *actual* knowledge by government officials of torturous conduct particular to the petitioner.

As noted at the outset, in denying Silva-Rengifo's motion to reopen, the *en banc* BIA reversed the Board's 2001 decision. The *en banc* Board relied upon the language of section 1208.18(a)(1) of the Convention's implementing regulations together with the Board's decision in *Matter of S-V-*, 22 I&N Dec. 1306 (BIA 2000). The Board reasoned that Silva-Rengifo had not established that any torture he might be subjected to "would be meted out by the government or those acting with the consent or *actual* acquiescence of the government," and that the Convention "does not extend to those who are harmed by groups the government is unable to control." App. at 38 (emphasis added).

We cannot accept the Board's conclusion that the

15

acquiescence that must be established under the CAT requires actual knowledge of torturous activity as required in *Matter of S-V-*. Similarly, although a government's ability to control a particular group may be relevant to an inquiry into governmental acquiescence under the CAT, that inquiry does not turn on a government's "ability to control" persons or groups engaging in torturous activity. *See, e.g. Tunis v. Gonzales,* 447 F.3d 547, 551 (7th Cir. 2006) (finding the issue of the Sierra Leone government's ability to control torture by private individuals irrelevant where the torturous activity—female circumcision—was legal and well-known to the government, thus concluding the applicant for relief under the CAT had satisfied her burden). The CAT does not require an alien to prove that the government in question approves of torture, or that it consents to it. Rather, as the court concluded in *Zheng v. Ashcroft*, 332 F.3d 1186, 1194 (9th Cir. 2003), an alien can satisfy the burden established for CAT relief by producing sufficient evidence that the government in question is willfully blind to such activities. *See id.* (holding that Congress has made clear that the correct inquiry under the Convention is whether an applicant can show that public officials demonstrate "willful

16

blindness" to the torture of their citizens by third parties).[6]  A

closer look at the decision in *Zheng* illustrates this point.

Zheng, a native of China, petitioned for review of an

Immigration Judge's decision denying his claim for relief under

the CAT.  Zheng had introduced evidence that he had been

smuggled out of China by "snakeheads," professional smugglers

who were part of "an enormous organization" that was very

powerful and pervasive.  332 F.3d at 1189.  An expert testified

that people who failed to pay their debts to those smugglers

faced death or torture including dismemberment.  *Id*. at 1189

n.5.  Evidence showed that the People's Republic of China

---

[6] Governmental acquiescence under the Torture Convention has been defined to include governments who are unable and unwilling to protect their citizens from persecution. *See, e.g., Orenelas-Chavez v. Gonzales*, 458 F.3d 1052, 1060 (9th Cir. 2006) (Under the CAT "[i]t is enough that public officials could have inferred the alleged torture was taking place, remained willfully blind to it, or simply stood by because of their inability or unwillingness to oppose it.") (citing *Zheng*, 332 F.3d at 1195 n.8); *see also* KRISTEN B. ROSATI, THE UNITED NATIONS CONVENTION AGAINST TORTURE: A SELF-EXECUTING TREATY THAT PREVENTS THE REMOVAL OF PERSONS INELIGIBLE FOR ASYLUM AND WITHHOLDING OF REMOVAL, 26 Denv. J. Int'l L. & Pol'y 533, 539 (1998); *compare Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002) (to establish eligibility for asylum, an applicant must demonstrate past persecution that is "committed by the government or forces the government is unable or unwilling to control").

"would not protect" its citizens from the wrath of snakeheads because "the existence of the snakeheads as a criminal syndicate was not acknowledged by [the government]." *Id*. Interceding on behalf of the syndicate's victims would be tantamount to an admission that the syndicate existed and cause the government to "'lose face,' which 'the Chinese government simply [was] not going to do . . .'." *Id*. (ellipsis in original).

Zheng testified that he was beaten and tortured by the snakeheads on board the boat bound for the United States and that he had been a material witness against some of these snakeheads in a criminal proceeding following his arrival in the continental United States from Guam. *Id*. at 1189-90. He reported both the torture and the names of the seamen involved in transporting him from China to Guam to United States officials. *Id*. at 1190. After doing so, he was approached by a snakehead while waiting to use the restroom and told to be careful as he might "be dead for sure." *Id*. Although Zheng had not feared reprisal while remaining under the protection of the United States government, he testified that if returned to China he would be killed or tortured by snakeheads or their associates and he therefore requested withholding of removal under the

18

CAT. The IJ found that Zheng had testified credibly. *Id*. at 1191.

To establish that the Chinese government acquiesced in the actions of the snakeheads, Zheng offered evidence of collusion between snakeheads and government officials. This included testimony about an instance where Zheng saw snakeheads give three cartons of cigarettes to police at the harbor before his group was allowed to board the boat they were smuggled out on, and evidence of several instances of socializing between government officials and snakeheads. *Id*. at 1190-91. Zheng argued that this established official participation in the smuggling.

The government opposed relief from removal, arguing that Zheng's testimony established nothing more than some collusion between local government or provincial officials, and that this did not establish acquiescence on the part of the Chinese government. The government's position was strengthened by a State Department Country Report on China stating that it appeared to be taking "active measures to target people smugglers [and that] . . . . several scores of people smugglers and [government officials] reportedly [had] been

convicted, fired from jobs, or expelled from the Communist Party." *Id*. at 1191.

The IJ rejected the government's argument based upon his conclusion that Zheng's testimony established that the government acquiesced to torture within the meaning of the CAT. The IJ granted withholding of removal under the CAT, explaining that Zheng's evidence established "that the government condones or at least is not willing to interfere and, in a way, acquiesces to the smugglers' conduct." *Id*. The INS appealed to the BIA. "The issue presented to the BIA was whether [Zheng] failed to demonstrate acquiescence of a public official or other person acting in an official capacity as required by 8 C.F.R. 208.18." *Id*. at 1191 (internal quotation marks omitted).

"The INS argued that the Chinese government turning a blind eye to its citizens being smuggled out of the country was not tantamount to acquiescence to torture." *Id*. at 1192. The INS attempted to rigidly compartmentalize the illegal actions of the snakeheads by claiming that,

> [e]ven if some Chinese police take bribes to let refugees pass through checkpoints, this is a purely non-violent and relatively benign offense. It does not raise any inference

20

whatsoever that such bribe-takers would be amenable to violence; i.e., that with *prior knowledge* they would allow the commission of acts of . . . torture . . . .

*Id*. (internal quotation marks and original brackets omitted, emphasis in original). The BIA sustained the INS's appeal, relying upon its decision in *Matter of S-V-*. The BIA concluded that even if factions within the Chinese government colluded in the snakehead's smuggling and took no action to stop it, that did not establish that the government acquiesced in torture. Zheng petitioned for review to the Court of Appeals for the Ninth Circuit.

The resolution of Zheng's petition for review "hinge[d] on the interpretation of the term *acquiescence* as used in 8 C.F.R. 208.18." *Zheng*, 332 F.3d at 1194 (emphasis in original). The Court of Appeals rejected the rationale of *Matter of S-V-*, and held that the Board's interpretation of "acquiescence" "impermissibly narrows Congress' clear intent in implementing relief under the Convention Against Torture." *Id*. The court concluded that Zheng did not have to establish the government's "actual knowledge" of torturous conduct as *Matter of S-V-* required. Rather, the court held that Zheng could establish the requisite governmental acquiescence by showing that

21

government officials were willfully blind to the activities of the snakeheads. We agree. We therefore reject the Board's reliance on *Matter of S-V-* here.

In *Matter of S-V-,* the BIA reviewed the removal order of a Colombian national who was residing in the United States as a lawful permanent resident when he was convicted of a crime of violence. The Board concluded he was removable, and the alien sought relief arguing that, if returned to Colombia, "he would be in danger from nongovernmental guerrilla, narcotrafficking, and paramilitary groups in Colombia . . . . [He claimed that] the guerillas finance their operations through kidnaping . . . [and] that he would be a target for kidnapers because he [had] family in the United States and [was] unable to speak Spanish correctly." 22 I&N Dec. at 1307. He submitted country reports and newspaper articles "detailing the violence, including kidnaping . . . [and] a Department of State travel warning stating that United States citizens have been the victims of threats, kidnaping, hijacking, and murder . . . ." as well as other reports and documentation. *Id.*

The BIA ruled that S-V- had not met his burden of demonstrating that he was eligible for relief under the CAT

because he had not shown that the Colombian government's failure to protect its citizens "[was] the result of deliberate acceptance of the guerillas' activities." *Id.* at 1313. The Board noted that torturous conduct must be inflicted "'by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.'" *Id.* at 1311 (quoting 8 C.F.R. § 208.18(a)(1)).

*Zheng*'s rejection of *Matter of S-V-* clarified the correct standard for "acquiescence" as set forth in the legislative history of the enactment of the CAT. A brief review of the Convention's implementing legislation confirms that Congress intended that relief under the Convention not be limited to situations where public officials have actual knowledge of torturous activity.

The CAT was submitted to the Senate by President Ronald Reagan for advice and consent on May 23, 1988. *See* S. Exec. Rep. 101-30, at 35 (1990). Along with the Convention, the President proposed 17 conditions, including an understanding that acquiescence meant that the "'public official, prior to the activity constituting torture, [must] have *knowledge* of such activity and thereafter breach his legal responsibility to

intervene to prevent such activity.'" *Khouzam v. Ashcroft*, 361

F.3d 161, 170 (2d Cir. 2004) (emphasis added) (quoting S. Exec.

Rep. 101-30, at 15 (1990)). However, upon review of the

proposed conditions, the Senate Foreign Relations Committee

was concerned that "knowledge" was too limiting and "created

the impression that the United States was not serious in its

commitment to end torture worldwide." *Id*.; *see also* S. Exec.

Rep. 101-30, at 4 (1990). These concerns were addressed two

years later when the first President Bush administration

submitted a revised and reduced list of proposed conditions. *Id*.

The revised list contained an understanding of the definition of

acquiescence that required that an official have only

"awareness" of the torturous activity, rather than "knowledge."

*Id*.

> The Senate Foreign Relations Committee reported that this change was intended to make it clear that *both* actual knowledge and 'willful blindness' fall within the definition of the term 'acquiescence.' The Senate adopted a resolution of advice and consent to ratification of the Convention on October 27, 1990, subject to the revised reservations, understandings, and declarations.

*Khouzam*, 361 F.3d at 170-71 (quotations and citations omitted)

(emphasis added). The regulations reflect this intention. *See*

C.F.R. § 208.18(a)(7) (requiring awareness, not knowledge of

24

torturous activity).  Notably, when President Clinton ultimately deposited the instrument of ratification with the United Nations on October 21, 1994, he included the Senate's understandings in the instrument of ratification.  *See* 1830 U.N.T.S. 320, 321 (1994).

As noted above, FARRA implements U.S. obligations under the CAT.  Pub. L. No. 105-277, div. G., tit. XXII, § 2242, 112 Stat. 2681-822 (codified at 8 U.S.C. § 1231 note).  The first section of FARRA, § 2242(a), contains a general statement of congressional policy not to return persons to countries where there are substantial grounds for believing the person would be in danger of being subjected to torture.[7]  The following section, § 2242(b), which substantively implements the Convention, directs "the heads of the appropriate agencies" to "prescribe regulations to implement the obligations of the United States under Article 3 of the [Convention], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the

---

[7] That condition is clearly satisfied if an alien can establish sufficient collusion between groups in the country, or factions within the government itself, whose actions are tolerated, if not condoned, by those in government.

25

Convention." 8 U.S.C.A. § 1231 note.  Hence, the Convention and its accompanying regulations must be read in conjunction with the understandings prescribed by the Senate, which make clear that the definition of "acquiescence" includes *both* actual knowledge *and* "willful blindness."[8]

As in *Zheng*, the court in *Khouzam* also recognized the import of the implementing legislation and senatorial understandings of the Convention in analyzing the legal standard for "acquiescence" under the CAT.  In *Khouzam,* the Second Circuit granted relief to an Egyptian seeking protection under the Convention on review of a final Board order.  361 F.3d 161.  Khouzam was an alien who was suspected by

---

[8] In addition to the language of the Convention itself and the Senate's understandings, the Convention's drafting history also supports this conclusion.  The Second Circuit notes that the consent or approval requirement would have been more consistent with the text first proposed by Sweden in 1979. *Khouzam*, 361 F.3d at 171.  It was the United States that proposed broadening this text to include acquiescence.  *Id*. (citing J. HERMAN BURGERS & HANS DANELIUS, THE UNITED NATIONS CONVENTION AGAINST TORTURE 4-42 (1988)).  The text suggested by the United States would have defined "public official" in Article 2 of the Convention to include those who "fail to take appropriate measures to prevent or suppress torture when such person has knowledge *or should have* knowledge that torture has or is being committed and has the authority or is in a position to take such measures . . . ."  Burgers & Danelius, *Supra*, at 42 (emphasis added).

Egyptian authorities of having committed a murder. *Id*. at 163.

He petitioned for relief from removal to Egypt based on

evidence that Egyptian police routinely exacted confessions

from accused criminals through torture. *Id*. at 169. The BIA

had rejected his claim, concluding that relief under the CAT

requires consent or approval of government officials.[9] *Id*. at

169-70. The court found this standard too high and reversed the

BIA's decision, holding that relief under the CAT does not

require "consent or approval" to torturous conduct, but instead

"requires only that government officials know of *or remain*

*willfully blind* to an act and thereafter breach their legal

responsibility to prevent it." *Id*. at 171 (emphasis added).

The error in *Matter of S-V-* may have arisen from the

Board's assumption that Congress "meant to exclude or modify"

---

[9] The court reversed the BIA deportation order on two bases, only one of which concerns our analysis here. The first basis for the court's reversal was the BIA's finding that Khouzam was fleeing from prosecution of a crime and therefore that any acts perpetrated against him would arise from a lawful sanction and therefore did not constitute torture. The court found such a conclusion "patently erroneous." *Khouzam*, 361 F.3d at 169. The court observed that "[i]t would totally eviscerate the CAT . . . [if] once someone is accused of a crime it is a legal impossibility for any abuse inflicted on that person to constitute torture." *Id*.

the legal effect of the Convention upon implementation. *See* 22 I&N Dec. at 1312. Based on this premise, the BIA interpreted the implementing legislation as "limiting," rather than expanding or simply clarifying, the section of the CAT which defines torturous acts as those committed with the consent or acquiescence of a public official. *See id.* Such an assumption is contrary to legislative history.

By attaching the aforementioned understanding, the Senate could hardly have made it clearer that it did not intend "acquiescence" in the Convention to require a showing that the government in question was actually aware of the conduct that constitutes torture. Rather, an alien seeking relief under the CAT can establish that the government in question acquiesces to torture by showing that the government is willfully blind to a group's activities. Any more restrictive reading of the CAT would be inconsistent with the fact that the Senate ratified the Convention only after attaching an understanding that acquiescence does not require "actual knowledge." *See* S. Exec. Rep. 101-30, at 36 (1990).

"To interpret the term acquiescence as the BIA did . . . misconstrues and ignores the clear Congressional intent quoted

by the BIA merely a paragraph above its restrictive holding."

*Zheng*, 332 F.3d at 1196. "The definition of torture has been properly left not to the INS, but to Congress, which instructed the INS to 'prescribe regulations to implement the obligations of the United States under Article 3 of the [Convention] *subject to any* reservations, *understandings*, declarations, and provisions contained in the United States Senate resolution of ratification of the Convention." *Id*. (brackets and emphasis in original).

Here, the record establishes that Silva-Rengifo produced evidence that may support a finding that the Colombian government is in a collusive relationship with certain groups that engage in torture. The evidence may also support a finding that the Colombian government actually participates in the type of torture he fears, in that it fails to prosecute officials and groups charged with human rights offenses. In his motion to reopen, Silva-Rengifo alleged:

> Government forces continued to commit numerous, serious abuses, including extrajudicial killings, at a level that was roughly similar to that of 1998. Despite some prosecutions and convictions, the authorities rarely brought officers of the security forces and the police charged with human rights offenses to justice, and impunity remains a problem . . . Paramilitary forces find a ready support base within the military and police . . . [There were n]o results reported in the investigation into

29

> cooperation between [the government's anti-kidnaping] squads and illegal paramilitary groups . . . Paramilitary groups were also responsible for kidnapings.

A.R. at 330, 338 (citing 1999 Country Reports on Human Rights Practices, released by the Bureau of Democracy, Human Rights, and Labor, U.S. Dept. of State, February 25, 2000).[10] Government participation in torture certainly suffices to establish acquiescence under the CAT, but it is not necessary. Evidence that officials turn a blind eye to certain groups' torturous conduct is no less probative of government acquiescence.

We thus reject the reasoning in *Matter of S-V-* and the rationale of the *en banc* Board in denying Silva-Rengifo's motion to reopen. In this regard we join our sister circuits. The "willful blindness" standard has been adopted by those courts of appeals that have addressed the legal standard for the

---

[10] In the analogous context of an asylum application, we have acknowledged that the Colombian government "has done little to address the problem of links between its military and paramilitary groups." *Vente v. Gonzales*, 415 F.3d 296, 302 n.5 (3d Cir. 2005) (quoting Human Rights Watch, *The "Sixth Division": Military-[P]aramilitary Ties and U.S. Policy in Colombia*, Sept. 2001).

30

"acquiescence" under the CAT.[11]  In addition to *Zheng* in the

Ninth Circuit and *Khouzam* in the Second, the Fourth, Fifth and

Sixth Circuits have adopted the "wilful blindness" standard for

acquiescence.  See *Lopez-Soto v. Ashcroft*, 383 F.3d 228, 240

(4th Cir. 2004) ("awareness includes both actual knowledge and

willful blindness.") (citing *Zheng*, 332 F.3d at 1194) (quotations

omitted); *Ontunez-Tursios v. Ashcroft*, 303 F.3d 341 (5th Cir.

2002);[12] *Ali v. Reno*, 237 F.3d 591 (6th Cir. 2001).

We are persuaded both by the the foregoing history of the

Convention's implementing legislation, and the sound logic of

our sister circuit courts of appeals, that the definition of

"acquiescence" adopted in *Matter of S-V-* was the wrong legal

standard to apply.  For purposes of CAT claims, acquiescence

---

[11] The Court of Appeals for the Eighth Circuit has not directly addressed the meaning of "acquiescence," although the issue has been presented to that court.  In *Perinpanathan v. INS*, 310 F.3d 594 (8th Cir. 2002), the court held that the petitioner could not successfully argue that he feared torture by the insurgent group, the "Liberation Tigers of Tamil Elam," because the Tigers are an illegal terrorist organization, "and its participants cannot be considered government officials." 310 F.3d at 599.  However, it is clear that the CAT is not limited to torture inflicted by government officials.

[12] The Court of Appeals for the Fifth Circuit recently affirmed the holding in *Ontunez-Tursios*, in *Chen v. Gonzales*, No. 05-60379, 2006 WL 3374974 (5th Cir. Nov. 22, 2006).

to torture requires only that government officials remain willfully blind to torturous conduct and breach their legal responsibility to prevent it. Accordingly, we conclude that the Board's *en banc* decision adopted an incorrect legal standard in requiring official "consent" or "actual acquiescence" rather than willful blindness as set out in the Convention's implementing regulations.

## B. Necessity of a Remand

Based on the Supreme Court's decision in *INS v. Ventura*, 537 U.S. 12 (2002) (*per curiam*), we do not review the evidence under the correct standard for acquiescence to determine if there is substantial evidence to support the BIA's conclusion that Silva-Rengifo does not qualify for relief under the Convention. Rather, we must remand to the BIA to give the BIA the first opportunity to apply the correct standard of acquiescence. *See id*. at 16 ("Generally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands."); *see also Zheng* at 1197 (remanding to the BIA to apply the correct standard of "acquiescence").

## IV. Conclusion

32

For the reasons set forth above, we grant Silva-Rengifo's petition for review, vacate the final order of removal, and remand to the BIA for further proceedings consistent with this opinion, which rejects the Board's erroneous reliance on *Matter of S-V-*. Silva-Rengifo's remaining claims are dismissed without prejudice and may be raised on remand for resolution by the Board or on further remand to the Immigration Judge.