**Luis Emilio PEREZ MUNIZ,**
**Petitioner**

v.

**ATTORNEY GENERAL OF**
**the UNITED STATES,**
**Respondent.**

No. 08–1444.

United States Court of Appeals,
Third Circuit.

Argued Jan. 26, 2010.

Filed Feb. 8, 2010.

Anayancy R. Houseman, Francis X. Geier [ARGUED], Elizabeth, NJ, for Petitioner.

Gregory G. Katsas, Richard M. Evans, Sharon Clay [ARGUED], Brooke M. Maurer, office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, DC, for Respondent.

Before: RENDELL and JORDAN, Circuit Judges, and PADOVA,* Senior District Judge.

## OPINION OF THE COURT

JORDAN, Circuit Judge.

Luis Emilio Perez Muniz ("Perez") petitions for review of a final order of the Board of Immigration Appeals ("BIA") denying his application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture ("CAT"). Perez claims that, if he is returned to his native Guatemala, he will face physical violence, including murder, like his father and uncles. Despite our sympathy for the suffering of Perez's family, we must deny his petition.

### I. Background

#### A. *Perez's Application for Asylum*

Perez, a thirty-one year old, unmarried citizen of Guatemala, entered the United States illegally in 1989 at the age of twelve.[1] He first applied for asylum in 1994, and his application was referred to an immigration judge on June 11, 2001. Perez was subsequently charged with being removable as an illegal alien. He conceded removability but sought relief from removal by applying for asylum, withholding of removal, and protection under the CAT. He also sought voluntary departure in the event his application was denied.

The case was postponed and continued for several years and, on October 11, 2005, was reassigned to a new Immigration Judge ("IJ") who scheduled it for an April 4, 2006 hearing. At the hearing, Perez

---

* Honorable John R. Padova, United States District Court Senior Judge for the Eastern District of Pennsylvania, sitting by designation.

1. Perez's initial removal petition lists him as having entered the United States on or about September 15, 1991, however, Perez amended his date of last entry as September 15, 1989 and Perez, his mother, and his sister testified that he entered the country in 1989.

withdrew his application for asylum, and the IJ continued the case until May 9, 2006 to allow counsel time to determine whether Perez was eligible for relief under the Nicaraguan Adjustment and Central American Relief Act ("NACARA").

On May 9, 2006, counsel for Perez informed the IJ that Perez was ineligible for NACARA relief and sought to reinstate his initial asylum application. The IJ scheduled a hearing on the merits of Perez's application for May 23, 2006, only two weeks later, out of concern for the Department of Justice's case completion goals. The IJ asked counsel whether she objected to the scheduling and counsel replied that she did not. The IJ made clear that, although she sought to resolve Perez's case by June in accordance with the case completion goals, "[i]f the case cannot be finished before the end of June then we won't finish it before the end of June because [Perez] need[s] to be afforded with a fair hearing...." (App. at 158.) The IJ also told Perez that if he and his counsel were able to convince the court that the scheduling is "hurting [Perez's] case," she would "have an open mind about [rescheduling]." (App. at 160.)

### B. *The May 23, 2006 Hearing*

On May 23, 2006, the IJ held the hearing on Perez's application for asylum, withholding of removal, relief under CAT, and voluntary departure in the alternative. Perez, his mother, and his sister testified concerning the kidnapping and murder of Perez's father and uncles in Guatemala.

Perez's mother testified that Perez's father had been in the Guatemalan army during the Guatemalan civil war, and that he retired in approximately 1983. On September 15, 1988, he was kidnapped by two men who came to the family home. Two other men took Perez's mother into the home and threatened her and her children should she report the kidnapping. The men left a note that read "hooray for the FARC." Perez's mother did not know who the men were and never learned what "FARC" meant, although she suspected it referred to guerillas.[2]

Perez's father returned a month later; his right hand had been mutilated, with two of his fingers cut off. Immediately thereafter, Perez and his sister, mother, and father fled Guatemala for Mexico, whereupon their family home in Guatemala was burned down. Perez's mother eventually sent Perez and his sister back to Guatemala to live with their godmother. Perez's father and mother continued on to the United States, though Perez's father was deported to Guatemala, while Perez's mother continued on to New Jersey. Perez's mother worked in New Jersey with the hope of bringing her children to the United States to join her, which she eventually did.

Perez's mother spoke with Perez's father only twice before she learned from her daughter in 1998 that he had been killed in Guatemala. Perez's mother testified that she knew nothing about Perez's father's activities between 1988 and 1998. Additionally, Perez's mother learned that

---

2. FARC is the acronym for the Fuerzas Armadas Revolucianarias de Colombia, a leftist guerilla revolutionary group active throughout much of Colombia. *See Gomez–Zuluaga v. Att'y Gen.*, 527 F.3d 330, 335 (3d Cir.2008). At the hearing, the IJ noted that she had only heard of FARC in connection with Colombia and counsel for Perez admitted that she was not aware of anything linking FARC's activities to Guatemala, other than possibly drug trafficking. The country report on Guatemala in the record does not mention a FARC presence in Guatemala.

Perez's uncles, who had also served in the military, were killed, although she testified that she knew nothing regarding the circumstances of their murders. Perez's mother expressed fear that, should her son return to Guatemala, he would suffer the same fate as his father.

Perez's sister also testified concerning the murder of her father. She testified that she did not know who committed the murder. She returned to Guatemala in 1998, approximately six months after her father was murdered, to identify the body and to obtain information from the police concerning their investigation into the murder. The police exhumed the body so that she could identify it. Perez's sister received two anonymous notes at her hotel, warning her to "be careful what you do" and threatening that "if you want to know what happened we will let you know exactly what happened." (App. at 285.) She informed the police of the notes, and, although they provided her with police protection, they suggested that she leave the country in light of the threats. She has not contacted the police to learn the status of the investigation, nor has she received any notice that the investigation has been resolved. Like her mother, Perez's sister fears that, if her brother were to return to Guatemala, he would suffer the same fate as their father.

Perez also testified at his hearing. Like his mother and sister, Perez testified that he does not know who killed his father or his uncles and that he has not made any efforts to contact the police, or anyone else in Guatemala, for more information. However, he testified that he fears returning to Guatemala because he fears that whoever killed his father and uncles would try to kill him as well.

## C. *The IJ and BIA's Decisions*

In an oral decision, the IJ denied Perez's application for asylum, withholding of removal and relief under CAT, but granted his petition for voluntary departure. The IJ found that Perez's mother and sister, and Perez himself, testified credibly as to the kidnapping and murder of Perez's father and uncles. But she noted that "there is a gaping hole [as to] who it is that the respondent actually fears" which "cannot be filled because none of the family can identify [who is responsible for the murder]." (App. at xviii.) She added, "[w]ithout knowing who it might have been who committed the murder, . . . the court cannot link the murder to the family as a potential social group, much less to the respondents race, religion, nationality, or even political opinion that might have been attributed to him as a result of his family membership. . . ." (App. at xix.) Furthermore, the IJ indicated that the fact that the police were investigating the murder and went so far as to exhume the father's body so that Perez's sister could identify it suggests that the Guatemalan government was not "unable or unwilling to control" whomever murdered Perez's father. (App. at xviii.) Ultimately, the IJ concluded that Perez lacked proof as to the identity and motive of the murderers of his father and uncles, and, thus, could not establish persecution as required to prevail on his application.

Perez appealed to the BIA. In a per curiam opinion, the BIA accepted the IJ's finding of facts and "adopt[ed] and affirm[ed] her comprehensive decision," noting the considerable uncertainty as to who murdered Perez's father, why they murdered Perez's father, and the extent of any connection between the father's kidnapping in 1988 and his murder ten years later. (App. at iii.) Perez then petitioned our Court for review.

## II. Discussion[3]

### A. The IJ's Determination is Supported by Substantial Evidence

■ The IJ expressed sympathy for Perez's situation but concluded that, in the absence of evidence as to the identity and motives of the murderer of Perez's father, Perez could not establish that he would suffer persecution upon return to Guatemala as a result of race, religion, nationality, membership in a particular social group, or political opinion. Perez argues that the IJ ignored evidence that he "had a well-founded fear of persecution because of his membership in a particular social group, i.e., children of members of the Guatemalan military," and that he possesses a "well-founded fear of persecution should he be removed to Guatemala due to the political opinion that would be imputed to him by the Guatemalan guerillas as a supporter of the Guatemalan government due to his father's service in the Guatemalan military." (Petitioner's Op. Br. at 2–3.) He relies heavily on his mother's testimony, which, according to Perez, established that his family was "targeted for persecution by the guerillas in Guatemala due to their service in the Guatemalan military during the Guatemalan Civil War." (Id. at 12.)

"Where, as here, the BIA adopts and affirms the decision of the IJ, as well as provides its own reasoning for its decision, the Court reviews both the decisions of the IJ and the BIA." Hashmi v. Att'y Gen., 531 F.3d 256, 259 (3d Cir.2008). An IJ's factual determinations must be upheld if supported by substantial evidence, INS v. Elias–Zacarias, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992), while questions of law are reviewed de novo,

Borges v. Gonzales, 402 F.3d 398, 404 (3d Cir.2005). "Findings of past and future persecution are factual determinations and are accordingly subject to ... deferential review." Al–Fara v. Gonzales, 404 F.3d 733, 738 (3d Cir.2005). Accordingly, the IJ's determination that Perez did not establish a well-founded fear of future persecution "can be reversed only if the evidence presented by [Perez] was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." See Elias–Zacarias, 502 U.S. at 481, 112 S.Ct. 812; see also Singh v. Gonzales, 406 F.3d 191, 195 (3d Cir.2005).

Perez seeks asylum, withholding of removal and relief under the CAT. The Attorney General may grant asylum to an alien who qualifies as a "refugee," defined by the Immigration and Nationality Act as "any person who is outside any country of such person's nationality ... and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42), 1158(b)(1). "To establish eligibility for asylum, an applicant must demonstrate past persecution by substantial evidence or a well-founded fear of persecution that is both subjectively and objectively reasonable." Singh, 406 F.3d at 195; see also Sheriff v. Att'y Gen., 587 F.3d 584, 589 (3d Cir.2009) ("A refugee is a 'person unable or unwilling to return to the country of that person's nationality or habitual residence because of past persecution or because of a well-founded fear of future persecution on account of h[er] race, religion, nationality, membership in a par-

---

**3.** We have appellate jurisdiction to review final orders of removal pursuant to 8 U.S.C. § 1252.

ticular social group, or political opinion.' " (quoting *Gao v. Ashcroft,* 299 F.3d 266, 271–72 (3d Cir.2002) (alteration in original))). The alien seeking asylum bears the burden of establishing that "race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." 8 U.S.C § 1158(b)(1)(B)(i); *see also* 8 C.F.R. § 1208.13. An alien can also satisfy his burden of proof by establishing persecution on account of a political opinion imputed to him by the foreign government. *Lukwago v. Ashcroft,* 329 F.3d 157, 181 (3d Cir.2003); *see also Chavarria v. Gonzalez,* 446 F.3d 508 (3d Cir.2006). The persecution must have been "committed either by the government or by forces that the government is either unable or unwilling to control." *Mulanga v. Ashcroft,* 349 F.3d 123, 132 (3d Cir.2003); *see also Lie v. Ashcroft,* 396 F.3d 530, 537 (3d Cir.2005). "[A]lthough an applicant is not required to provide direct proof of his persecutor's motives, 'he must provide *some* evidence of it, direct or circumstantial.' " *Lukwago,* 329 F.3d at 170 (quoting *Elias–Zacarias,* 502 U.S. at 483, 112 S.Ct. 812) (emphasis in original).

An alien is entitled to withholding of removal to a country "if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3). Withholding of removal is only available if the alien meets a stricter standard than asylum, namely whether "it is 'more likely than not' that he or she will be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion if deported to his or her home country." *Singh,* 406 F.3d at 196. "Given this higher standard, an applicant who does not qualify for asy-

lum also does not qualify for withholding of removal." *Guo v. Ashcroft,* 386 F.3d 556, 561 n. 4 (3d Cir.2004).

In order to be eligible for protection under the CAT, an applicant must establish that "it is more likely than not that he will be tortured if removed." *Lukwago,* 329 F.3d at 182–83. "The CAT does not require a showing that the torture is on account of any protected ground, but only applies to torture that 'is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.' " *Id.* at 183 (quoting 8 C.F.R. § 208.18(a)(1)). "[A]n alien seeking relief under the CAT can establish that the government in question acquiesces to torture by showing that the government is willfully blind to a group's activities." *Silva–Rengifo v. Att'y Gen.,* 473 F.3d 58, 69 (3d Cir.2007). A foreign government's willingness or ability to control a particular group is therefore relevant, but not conclusive of, governmental acquiescence. *Id.* at 65.

All three witnesses at the hearing— Perez, his mother, and his sister—testified that they did not know who kidnapped or killed Perez's father or who killed his uncles. Even though Perez's mother testified that his father's abductors left a paper identifying the FARC, she also testified that she did not know who the FARC was other than suggesting that they might be guerillas. No evidence, beyond the cryptic note found by the mother, indicates that the FARC had ever been active in Guatemala. And, although Perez's father and uncles were in the Guatemalan military, Perez's father retired from the military five years before his kidnapping and fifteen years before his murder. Furthermore, no witness had any information concerning Perez's father's activities in Guatemala during the

decade between his kidnapping and murder.

Similarly, despite Perez's assertions that the threats his sister received upon return to Guatemala indicate that, if he returned to Guatemala, his father's killers would impute to him a given political opinion, the record is devoid of any indication as to who left the anonymous notes at her hotel in Guatemala when she returned to identify her father's body. Perez urges that the threatening notes received by his sister establish imputed political opinion. This is speculative at best, as the notes contain no reference whatsoever to any opinion or motive, but merely warned her to stop investigating her father's death. Furthermore, the sister's testimony established that the authorities in Guatemala investigated the murder and provided her with police protection, indicating that the government was concerned with locating the perpetrators and controlling the situation. The fact that the authorities made efforts to investigate the murder countervails the notion that the alleged acts of persecution were committed by the Guatemalan government or by a force that the Guatemalan government was unwilling or unable to control. It also supports the IJ's conclusion that Perez could not establish fear of persecution sufficient to carry his burden on his asylum application.

Given the uncertainty surrounding the identity of who murdered Perez's father and uncles and the motive for those murders, we cannot say that the IJ and BIA's decisions were erroneous. Simply because Perez's father was, at one point, a member of the Guatemalan military does not mandate the conclusion that his killers fifteen years later acted based on assumptions about his political opinion. Nor do the threatening notes received by Perez's sister require the conclusion that some political opinion will be imputed to Perez or that he will be targeted as a child of a member of the Guatemalan military, because there is no evidence indicating who wrote the notes or why the author targeted Perez's sister. *See Singh,* 406 F.3d at 196–97 (noting that, in cases concerning imputed political opinion, "[t]he focus is ... on whether this attribution [of political opinion to the applicant for asylum] has in fact occurred."); *see also Sangha v. INS,* 103 F.3d 1482, 1489 (9th Cir.1997) ("To establish an imputed political opinion, the applicant must show that his persecutors actually imputed a political opinion to him.").

Perez asserts that he has presented "circumstantial evidence that the Guatemalan guerillas kidnapped [his] father and murdered [his] father and his uncles due to their service in the Guatemalan military." (Petitioner's Reply Br. at 7.) But the only circumstantial evidence upon which Perez relies is the note stating "hooray for the FARC," allegedly left by the kidnappers, and the fact that his father and uncles served in the military at some point in the distant past. That evidence is weak at best and, as discussed above, leaves considerable gaps in Perez's case. Furthermore, even if the evidence could arguably support a finding of persecution, it does not compel such a finding. Since the record supports the conclusion that there is insufficient evidence establishing that Perez would be persecuted based on membership in a social group or an imputed political opinion upon return to Guatemala, there is no basis for vacating the BIA's decision.[4] *See Am. Textile Mfrs. Inst.,*

---

4. Perez also argues "[t]he persecution of [his] father should be evaluated in light of [Perez's] age at the time [his] father was kidnapped and brutalized and the family home was burnt down," (Petitioner's Reply Br. at 7, relying on *Hernandez–Ortiz v. Gonzales,* 496 F.3d 1042, 1045 (9th Cir.2007) ("[A]ge can be a critical factor in the adjudication of asylum claims

*Inc. v. Donovan,* 452 U.S. 490, 523, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence . . . ." (internal quotations omitted)). In sum, although Perez presents sympathetic circumstances, the absence of evidence as to who murdered his family members and the motive for committing those murders supports the IJ and the BIA's denial of Perez's application for asylum, withholding of removal, and protection under CAT.[5]

### B. *Perez's Due Process Rights Were Not Violated*

■ Perez also argues that the IJ violated his procedural due process rights "by expediting [his] hearing in order to complete [his] case by the end of June, 2006 so as to comply with the case completion goals established by the United States Department of Justice." (Petitioner's Op. Br. at 18.) Specifically, Perez takes issue with the IJ's decision at the May 9, 2006 hearing—at which counsel for Perez informed the IJ that Perez was ineligible for NACARA and that Perez sought to reinstate his initial asylum application—to schedule the hearing on the reinstated application for May 23, 2006. According to Perez, the IJ's expedited scheduling deprived him of additional time to investigate the identities and motives of the individuals who murdered his father and threatened his sister.

"Aliens facing removal are entitled to due process." *Kamara v. Att'y Gen.,* 420 F.3d 202, 211 (3d Cir.2005). In the context of removal hearings, an alien is entitled to a full and fair hearing and a reasonable opportunity to present evidence. *Singh v. Gonzales,* 432 F.3d 533, 541 (3d Cir.2006). To prevail on a due process claim, an alien "must show that he was prevented from reasonably presenting his case." *Khan v. Att'y Gen.,* 448 F.3d 226, 236 (3d Cir.2006) (internal quotations omitted). Additionally, the alien must establish substantial prejudice as a result of the alleged procedural error. *Singh,* 432 F.3d at 541. Our review of Perez's due process claim is plenary. *See id.*

Perez has not established that the scheduling of his hearing deprived him of due process. Although the hearing was scheduled two weeks after Perez reinstated his application for asylum, Perez ignores the fact that he had the opportunity to investigate the identity and motive of his father's killers long before that. Indeed, a hearing on Perez's initial asylum application was scheduled for April 19, 2002. The matter was repeatedly continued, and there is no apparent reason why he could not have investigated his claims during that time. In fact, Perez testified that he never made any such effort to identify his father's killer.

Moreover, the IJ specifically asked counsel for Perez whether she had any objection to the scheduling of the hearing on May 23, 2006 and counsel replied that she did not. Although the IJ indicated

---

and may bear heavily on the question of whether an applicant was persecuted or whether she holds a well-founded fear of future persecution." (quoting *Liu v. Ashcroft,* 380 F.3d 307, 314 (7th Cir.2004) (alteration in original)).) However, taking Perez's age into consideration does not cure his inability to establish the motive of those responsible for the murders of his father and uncles.

5. Since Perez cannot meet his burden on his application for asylum, his claim for withholding of removal likewise fails. Furthermore, since there is no evidence suggesting that Perez would suffer torture as a result of the consent or acquiescence of the Guatemalan government, the IJ and BIA appropriately rejected his CAT claim.

that she sought to abide by case completion guidelines, she also made clear that the requirement that Perez receive a fair hearing was of greater importance than the court's schedule. Additionally, the IJ stated that she would "have an open mind" if Perez and his counsel established a hardship as a result of the schedule, but there is no indication that Perez ever sought a continuance based on the concerns he raises now. (App. at 160.) Accordingly, Perez cannot establish that he was precluded from presenting his case or that he suffered any prejudice, let alone substantial prejudice, as a result of the IJ's holding the hearing when she did. Since Perez received a full and fair hearing on his application, he cannot establish any due process violation.[6]

## III.  Conclusion

For the foregoing reasons, we will deny Perez's petition for review.

---

6. Perez's reliance on *Hashmi v. Attorney General of the United States*, 531 F.3d 256 (3d Cir.2008) is misplaced. In that case, Hashmi was subject to removal proceedings, but his wife, a United States citizen, had petitioned for residency based on their marriage. *Id.* at 257–58. The removal proceedings and the petition for residency proceeded on separate tracks within the Department of Homeland Security, but the government employees responsible for handling the respective matters failed to share information necessary for resolving both claims, delaying both proceedings. *Id.* at 258–59. The IJ granted three continuances of the removal proceedings because of the pending residency petition. *Id.* at 258. In light of the continued delay on the residency petition through no fault of his own, Hashmi requested an additional six-month continuance, which the government did not oppose. *Id.* at 259. The IJ denied the request, noting his obligation to resolve the case within the time frame established by the DOJ's case-completion goals, and found Hashmi removable. *Id.* We held that the IJ's denial of the unopposed motion for a continuance, based solely on case completion goals, was an abuse of discretion and explained that case-completion goals "should not be read as an end in themselves but as a means to prompt and fair dispositions, giving due regard to the unique facts and circumstances of the case." *Id.* at 258, 261.

Unlike *Hashmi*, the matter before us concerns the scheduling of a hearing on a date that was specifically agreed to by counsel for Perez. There is no reason an IJ cannot schedule a hearing on a date that conforms to the DOJ's case completion guidelines so long as the alien is not unduly prejudiced by the timeframe. Importantly, counsel for Perez never requested a continuance and never indicated to the IJ that the scheduling posed a hardship for her client, despite the IJ's clear willingness to reschedule if necessary. Accordingly, there is nothing about the circumstances of Perez's case that raises concerns akin to those in *Hashmi*.