**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-3300
_____

JULIANA MARTIREZ ARREAGA BRAVO,
                                                        Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA
_____

On Petition for Review of a Decision
And Order of the Board of Immigration Appeals
(BIA-1: A209-004-970)
Immigration Judge: Dinesh C. Verma
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
July 13, 2021

Before:  MCKEE, GREENAWAY, JR., and RESTREPO, *Circuit Judges*

(Filed: October 28, 2021)
_____

Opinion
_____

Brett A. Tarver
Troutman Pepper
600 Peachtree Street, N.E.
Suite 2500, Bank of America Plaza
Atlanta, GA 30308

Anthony C. Vale
Troutman Pepper Hamilton Sanders
3000 Two Logan Square

18th and Arch Streets
Philadelphia, PA 19103
    *Attorneys for Petitioner*

Merrick Garland, Attorney General
Lindsay Marshall
Jeffrey R. Meyer
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
    *Attorneys for Respondent*


GREENAWAY, JR., *Circuit Judge*.

When an Immigration Judge ("IJ") makes findings of fact in relation to an individual's petition for relief under the Convention Against Torture ("CAT"), the Board of Immigration Appeals ("BIA"), in reviewing the IJ's decision, must defer to the IJ's factual findings unless they are clearly erroneous.

Here, the IJ held that Petitioner Juliana Martirez Arreaga-Bravo demonstrated that she will more likely than not experience torture if she returns to Guatemala, and that the Guatemalan government would acquiesce in such torture. The IJ thus granted her application for CAT relief and ordered withholding of removal. The Department of Homeland Security appealed, and the BIA reversed—instituting a removal order. In coming to its conclusion, the BIA explained that it was not "sufficiently persuade[d]" that Arreaga-Bravo faces a particularized risk of torture and that it was "unable to agree" with the IJ's conclusions. A.R. 5. Rather than defer to the IJ's factual findings and review for clear error, the BIA inserted itself into the factfinder role and disagreed with the IJ's

2

weighing of the evidence.  This was error.  As a result, we will vacate the BIA's final order of removal and remand with instructions to reinstate the decision of the IJ.

## I.  BACKGROUND

Arreaga-Bravo is a thirty-one-year-old woman from Tacana, Guatemala. **A.R 171**. She arrived in the United States in May 2016.  **A.R. 171.**  Shortly after entering the country, the Department of Homeland Security began removal proceedings by issuing a Notice to Appear ("NTA").  **A.R. 65.**  At a Master Calendar hearing in December 2016, Arreaga-Bravo admitted to the factual allegations in the NTA. **A.R. 65.**  In May 2017, she applied for asylum and withholding of removal under CAT.  **A.R. 65.**

Arreaga-Bravo claimed that she had fled Guatemala to escape harassment and sexual violence by the Mara 18 gang.  **A.R 171.**  She testified that violence against women is prevalent in Guatemala.  To support this claim, she discussed the rape of her older sister, who was fifteen years old at the time of the incident.  **A.R. 129.**  Arreaga-Bravo noted the rape was not reported to the police because the nearest police station was four hours away.  **A.R. 70, 175-76.**  After the incident, Arreaga-Bravo's family moved to a town called Amorisan.  **A.R. 132.**  Arreaga-Bravo alleged that after moving, her youngest sister was raped by a man.  **A.R. 71, 174.**  Arreaga-Bravo stated that there was a police report filed, but the police never investigated the complaint further or arrested the man for rape.  **A.R. 134.**  Arreaga-Bravo also alleged that the rapist's mother offered her family a bribe, which the family turned down and also reported to the police.  **A.R. 175.**

Arreaga-Bravo explained that after the incident with her younger sister, her family once again moved, this time, to a town called Malacatan.  **A.R. 70.**  Arreaga-Bravo stated

3

that while living in Malacatan, she worked in Talisman, a dangerous town near the Mexican border.  **A.R. 171.**  In her amended affidavit, Arreaga-Bravo detailed an event in which a friend in Talisman was raped by multiple men while working.  **A.R. 171-72.**

As for her own experiences, Arreaga-Bravo discussed an event in which a man came inside her store and asked how much it would cost to sleep with her.  **A.R. 66.**  She alleged that in early 2016, she was targeted by Mara 18 gang members to be enlisted to become a gang member's girlfriend.  **A.R. 3, 66.**  Arreaga-Bravo refused and from that point she began to receive threatening messages.  **A.R. 66.**  Arreaga-Bravo was told that eventually she would have to capitulate to the gang's demands.  **A.R. 66, 173.**  The harassment against her escalated until one day, two men grabbed her on the street, pulled out a knife, and threatened to kill her unless she surrendered to the gang.  **A.R. 69, 176.**  Arreaga-Bravo described this event as the impetus for her fleeing to the United States.  **A.R. 176.**  She testified that she did not relocate within the country because she felt that the Mara 18 gang would threaten her wherever she lived and that if she returned to Guatemala, gang members would find her and kill her.  **A.R. 67.**

In April 2018, the IJ issued a thorough and well-reasoned twenty-four-page decision.  **A.R 64.**  The IJ found that Arreaga-Bravo was generally credible, candid, and forthcoming.  **A.R. 74.**  As for Arreaga-Bravo's claim for asylum, the IJ found that she had not established past persecution or well-founded fear of future persecution because her proposed social groups—"Guatemalan women," "Young Guatemalan females," and "Guatemalan females subjected to gang recruitment who refuse such recruitment"—did not qualify as particular social groups sufficient to obtain relief.  **A.R. 79-83.**  The IJ

4

explained that Arreaga-Bravo's complaints of harassment did not rise to the level of past persecution because the harassment was not "imminent, concrete and menacing" as to cause actual harm. A.R. 76 (quoting *Chavarria v. Gonzalez*, 446 F.3d 508, 518 (3d Cir. 2006)).

But as for her withholding of removal claim under CAT, the IJ found that it is more likely than not that Arreaga-Bravo will be harmed if she returns to Guatemala. **A.R. 84.** The IJ assessed that based on the evidence—including events experienced by Arreaga-Bravo, her sisters, and friend, and a country conditions report outlining that Guatemala has the third highest rate of femicide in the world—Arreaga-Bravo was vulnerable and would more likely than not be raped or killed in Guatemala. **A.R. 85.**

The IJ further found that, based on evidence presented, the Guatemalan government would acquiesce in Arreaga-Bravo's torture. **A.R. 85.** The IJ explained that evidence presented—including the police not filing charges against her younger sister's rapist and country conditions evidence showing that the Guatemalan government cannot control violence against women—was enough to establish the government would acquiesce in the torture of Arreaga-Bravo. **A.R. 86.** The IJ noted that while the Guatemalan government has passed a law to combat violence against women, the law is not fully prosecuted, and did not preclude the finding that the government would still acquiesce to torture. **A.R. 86.** Accordingly, the IJ granted Arreaga-Bravo's application for CAT relief. **A.R. 87.**

The Government appealed the IJ's decision. **A.R. 3.** Before reviewing the IJ's findings, the BIA acknowledged that it was reviewing findings of fact for clear error,

5

including any credibility determinations, and reviewing de novo all other issues. **A.R. 3.**
The BIA found that Arreaga-Bravo had not established eligibility for protection under
CAT, concluding that the record did not support that it was more likely than not that she
would be tortured with the acquiescence of the government. **A.R. 4-5.** The BIA
explained that the IJ had speculated in determining Arreaga-Bravo's likelihood of torture.
**A.R. 4.** The BIA explained that, while the country conditions report evidenced violence
against women in Guatemala generally, it was not persuaded that Arreaga-Bravo faced a
particularized risk of harm. **A.R. 5.** As such, the BIA held it was "unable to uphold" the
IJ's decision granting the application for protection under CAT. A.R. 5. This appeal
followed.

## II.    JURISDICTION AND STANDARD OF REVIEW

The BIA had jurisdiction under 8 C.F.R. § 1003.1(b)(3). We have jurisdiction
under 8 U.S.C. § 1252(a).

For findings of fact, the BIA is required to apply a clearly erroneous standard of
review to the IJ's determinations, 8 C.F.R. § 1003.1(d)(3)(i), and a de novo standard of
review to the IJ's decisions of law, 8 C.F.R. § 1003.1(d)(3)(ii). We review de novo
whether the agency properly analyzed the applicant's CAT protection claim. *See*
*Quinteros v. Att'y Gen.*, 945 F.3d 772, 786 (3d Cir. 2019).

## III.    DISCUSSION

Arreaga-Bravo argues that the BIA erred in rejecting the IJ's factual finding that it
was more likely than not that she would be tortured if she returned to Guatemala. She

6

also maintains that the BIA applied the wrong standard of review to the IJ's finding that the Guatemalan government will acquiesce in that torture.  **Pet'r's Br. 21, 25.**

## A.     LIKELIHOOD OF FUTURE TORTURE

We agree with Arreaga-Bravo that the BIA failed to apply the clearly erroneous standard in reversing the IJ's factual determination on the likelihood of future torture.

To qualify for relief under CAT, an individual must establish that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2); *see Kaplun v. Att'y Gen.*, 602 F.3d 260, 268 (3d Cir. 2010). Torture is defined as "an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture."  8 C.F.R. § 1208.18(a)(2).  Likelihood of future torture is "a mixed question of law and fact" which requires "the IJ [to] address two questions: '(1) what is likely to happen if the petitioner is removed; and (2) does what is likely to happen amount to the legal definition of torture?'" *Myrie v. Att'y Gen.*, 855 F.3d 509, 516 (3d Cir. 2017) (quoting *Kaplun*, 602 F.3d at 271).

In support of her CAT claim, Arreaga-Bravo provided: her own testimony; an amended affidavit describing her experiences; police and medical reports on the 2005 rape of her sister in Malacatan; news articles describing the existent country conditions in Guatemala; and the declarations of three experts about gender-based violence in Guatemala and the effect of trauma on an asylum applicant's ability to recall and recount his or her experiences.  **A.R. 106-62; 171-77; 180-201; 202-64; 269-96; 297-302;** *see*

7

*also* **A.R. 436-70 (2016 Human Rights Report, prepared by the U.S. Department of State).**

The IJ made a factual determination that Arreaga-Bravo would "more likely than not . . . be raped or killed if she returned to Guatemala." A.R. 84. The IJ explained that Arreaga-Bravo's "childhood, adolescence, and early adulthood in Guatemala were plagued with instances of violence against women." A.R. 84-85. The IJ detailed these events:

> When [Arreaga-Bravo] was very young, her older sister was raped by a gang member while they were living in La Batalia. Years later, [Arreaga-Bravo's] younger sister was also raped by a known gang member while they were living in Amorisan. When [Arreaga-Bravo] began working in Talisman, a border town close to Mexico, men often propositioned her for sex, and her friend, who sold ice cream in Talisman, was raped by multiple gang members. When [Arreaga-Bravo] moved to Malicatan, her and her friend were held up at gunpoint and, on another occasion, gang members broke into her family's home and stole all of their valuables. Beginning in 2016, Mara 18 attempted to recruit [Arreaga-Bravo] to be the girlfriend of one of their gang members. When [Arreaga-Bravo] refused, she started receiving threatening phone messages. [Arreaga-Bravo] changed her telephone number, but the gang members somehow found her new number and continued sending her messages. Two Mara 18 gang members subsequently approached [Arreaga-Bravo] on the street, held her a[t] knifepoint, and threatened to kill her and her family if she refused to join their gang. [Arreaga-Bravo] fled Guatemala shortly after this incident in April 2016.

A.R. 85.

These events, combined with country conditions evidence presented about the "persistent" and "lethal violence against women" in Guatemala, led the IJ to find that Arreaga-Bravo had satisfied her burden of establishing likelihood of future torture. A.R. 85; *see id.* ("[Arreaga-Bravo's] prior encounters with Mara 18, coupled with her sisters' instances of past torture, her inability to internally relocate, and her return to a country

8

with a staggering rate of violence against women, makes it more likely than not that [Arreaga-Bravo] would be raped or killed in Guatemala.").

In reviewing this finding on appeal, the BIA concluded "that the record does not support that it is more likely than not that [Arreaga-Bravo] will be tortured in Guatemala." A.R. 4. The BIA acknowledged the horrific incidents involving Arreaga-Bravo's sisters and friend. **A.R. 4.** But it noted that "the record is unclear" if there are ongoing problems related to Arreaga-Bravo's sisters. A.R. 4–5. It explained that "the absence of past torture and sufficiently individualized evidence that it is more likely than not that specifically [Arreaga-Bravo] will be tortured" means it is "unable to agree with the Immigration Judge's predictive finding." A.R. 5-6. And overall, "on this record, the overall evidence does not sufficiently persuade us that [Arreaga-Bravo] faces a particularized risk of torture." A.R. 5.

We have explained that a finding is clearly erroneous "when . . . the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Murray*, 821 F.3d 386, 391 (3d Cir. 2016) (internal quotation marks and citation omitted). But if "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Fed. Trade Comm'n v. AbbVie Inc.*, 976 F.3d 327, 368 (3d Cir. 2020) (internal quotation marks and citation omitted). That is the case here.

It was not the BIA's role to determine whether it agreed with the IJ's weighing of the evidence in Arreaga-Bravo's favor. Its role was to point to findings by the IJ that were "an obvious, plain, gross, significant, or manifest error or miscalculation."

9

*Mendoza-Ordonez v. Att'y Gen.*, 869 F.3d 164, 169 (3d Cir. 2017) (internal quotation marks and citation omitted).[1]  Rather than do this, the BIA substituted its view of the evidence for that of the IJ, rather than reviewing for clear error, and concluded that it was "not sufficiently persuade[d]" with the IJ's conclusion.  A.R. 5.  But the clear error "standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Alimbaev v. Att'y Gen.*, 872 F.3d 188, 195 (3d Cir. 2017) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985)).

### B.  GOVERNMENT ACQUIESENCE

The BIA's misapplication of the clearly erroneous standard also plagued its analysis of the IJ's determination about government acquiescence.

In *Myrie*, we explained that:

> In assessing whether an applicant has established that public officials will acquiesce to the feared tortuous [sic] acts of a non-state actor, the IJ also must conduct a two-part analysis.  First, the IJ makes a factual finding or findings as to how public officials will likely act in response to the harm the petitioner fears. Next, the IJ assesses whether the likely response from public officials qualifies as acquiescence under the governing regulations. . . . While the Board reviews the first part for clear error, it must review the second de novo.

---

[1] The only instance in which the BIA seemingly applied clear error review was in addressing whether Arreaga-Bravo would be "an ideal target for gang recruitment."  A.R. 4.  The BIA held that the IJ's description of Arreaga-Bravo "as a single female" was "clearly erroneous" because "the record reflects that she is no longer single."  A.R. 4. But as Arreaga-Bravo correctly points out, "[n]ot only is there no such evidence in the record, but this small point does not provide sufficient reasoning to overturn the IJ's broader findings."  Pet'r's Br. 24.

10

855 F.3d at 516-17. The BIA and the IJ "must answer" both prongs "when evaluating a CAT claim," and they "may not ignore evidence favorable to the alien." *Quinteros*, 945 F.3d at 786.

The IJ determined that "[b]ased on the evidence before the Court . . . the Guatemalan government would remain willfully blind to the tortuous [sic] actions carried out by gangs and other criminal organizations against women in Guatemala." A.R. 85–86. The IJ first invoked Arreaga-Bravo's own experience as support:

> [Arreaga-Bravo] credibly testified that her younger sister . . . was raped by a known gang member in 2005. [Arreaga-Bravo's] parents reported the rape to the police, but, despite providing medical proof of the rape and identifying the individual responsible, the police stopped investigating [the] rape. Shortly before this, the mother of [Arreaga-Bravo's sister's] rapist bribed [Arreaga-Bravo's] mother to drop the charges. When [Arreaga-Bravo]'s mother refused the bribe, [Arreaga-Bravo] heard rumors that the mother of [Arreaga-Bravo's sister's] rapist then bribed the police to drop the charges. [The] rapist was never arrested and no charges were filed against him.

A.R. 86.

Then, the IJ expounded on the country conditions evidence in the record, which bolstered the IJ's conclusion that the Guatemalan government would remain willfully blind to foreseeable torture of Arreaga-Bravo. **A.R. 86.** The IJ noted that statistics continue to show "one woman killed every twelve hours" and "a new case of sexual violence reported every forty-six minutes," A.R. 86 (citing the 2016 Human Rights Report), and the government's efforts to prosecute these crimes remain poor. *See* A.R. 87 ("In 2011, more than 20,000 cases were filed with the courts under the 2008 Law Against Femicide, however, less than three percent of those cases resulted in a judgment").

11

On appeal, the BIA held that "the record does not support that it is more likely than not that [Arreaga-Bravo] will be tortured 'by or at the instigation of or with the consent of a public official or other person acting in an official capacity.'" A.R. 5 (citing 8 C.F.R. § 1208.18(a)(7)). The BIA noted that there was no evidence that Arreaga-Bravo was "harmed by a government official." A.R. 5. The BIA added that it is "unclear whether [Arreaga-Bravo] ever reported her own mistreatments to the police," and that the "record does not support that the younger sister's incident from more than a decade earlier, which allegedly involved police bribery and corruption, is indicative of government acquiescence involving [Arreaga-Bravo]." A.R. 5. It therefore concluded that "the overall evidence is insufficient to show that the police would specifically fail to act, or that their inability to provide assistance would constitute 'consent or acquiescence' under the regulations.'" A.R. 5.

Again, the BIA improperly reviewed the IJ's factual findings. In accordance with 8 C.F.R. § 1003.1(d)(3)(i), the BIA needed to review the IJ's finding of fact on the government acquiescence question for clear error. But the BIA did not state that it was clearly erroneous for the IJ to find that the Guatemalan government would be unable to protect Arreaga-Bravo from the serious harm he found she was likely to suffer if removed back to Guatemala. Instead, the BIA seemed to review de novo the IJ's factual findings

12

as to how the government is likely to respond to Arreaga-Bravo's harm.[2]  This was error. The BIA stepped out of the bounds of its permissible role.

## IV. CONCLUSION

Given the strength and rigor of the IJ's underlying opinion, along with the BIA having exceeded its proper scope of review, we will vacate the BIA's final order of removal and remand with instructions to reinstate the IJ's opinion.

---

[2] In its opposition brief, the Government appears to admit as such.  Resp't's Br. 29 ("[T]he Board reviewed de novo the Immigration Judge's determination that the Guatemalan authorities would acquiesce to Petitioner's torture by Mara 18.").