**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 22-1854
_____

YAHYE HERROW,

Petitioner

v.

ATTORNEY GENERAL
UNITED STATES OF AMERICA

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No. A075-713-985)
Immigration Judge: David W. Crosland

Argued on March 22, 2023

Before: RESTREPO, PHIPPS and ROTH, <u>Circuit Judges</u>

(Opinion filed: February 13, 2024)

Christopher M. Casazza
Caitlin J. Costello    **(ARGUED)**
Palladino, Isbell & Casazza
1528 Walnut Street
Suite 1701
Philadelphia, PA 19102

　　　　　Counsel for Petitioner


Michael Engler
Tracie N. Jones        **(ARGUED)**
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878 Ben Franklin Station
Washington, DC 20044

　　　　　Counsel for Respondent

---

O P I N I O N

---

**ROTH**, Circuit Judge:

Yahye Herrow petitions for review of the Board of Immigration Appeal's (BIA) denial of his claims for withholding of removal and relief under the Convention Against Torture (CAT). He contends that the BIA erred in failing to consider evidence favorable to his CAT claim and in

finding that "Repatriated Minority Somalis" does not constitute a cognizable particular social group. We agree with the BIA that "Repatriated Minority Somalis" does not constitute a cognizable particular social group. Therefore, we will deny his claim for withholding of removal. However, we conclude that the BIA, in deciding his CAT claim, failed to consider evidence favorable to Herrow. For that reason, we will remand his petition as it applies to that claim.

## I. BACKGROUND

### A. Factual Background

Yahye Herrow is a member of the Bandabow Tribe,[1] which is a sub-clan of the Reer Hamar Benadiri. The Reer Hamar are ethnic Somali Bantus, a minority in Somalia. He and his family, who lived in Mogadishu, have been targeted because of their tribal affiliation. The Darod and Hawiye tribes burned the homes of his people, who "did not have any rights."[2] Al Shabaab[3] and other terror groups have also subjected his family to violence. Herrow's brother, Usman, died in a 2005 hotel explosion that killed 700 people. A bombing in Mogadishu also killed Herrow's sister, Fatima.

In 1992, Herrow and his family fled Mogadishu. Days

---

[1] The record includes varied spellings of Bandabow, including Bandawow and Bandhowow. Each refers to the same minority clan to which Herrow belongs.

[2] Certified Administrative Record (CAR) 112.

[3] Al-Shabaab, Al-Shabbab, Al Shabbab, Al Shabaab, and the Shabab are used interchangeably throughout the record to refer to the same group in Somalia.

3

later, they arrived in Nairobi, Kenya, where Herrow stayed until May 2000, when his aunt and clans people arranged for a smuggler to bring him to the United States.

Herrow arrived in the United States through Mexico with a Kenyan passport. He immediately applied for asylum.[4] In July 2000, Herrow was granted asylum in Los Angeles, California. He met his wife Munira Mohamed Adan, a U.S. citizen, in 2001. They are currently married, and she resides in Minneapolis, Minnesota. One of his brothers still lives in Somalia, but he does not work and "hides around and lives in different places."[5] Herrow is not aware of his location.

## B. Procedural History

### i. Conviction and Notice to Appear

In 2018, a jury in the United States District Court for the District of Minnesota convicted Herrow of Conspiracy to Commit Mail Fraud and Wire Fraud, in violation of 18 U.S.C. §§ 1349 and 1341, for his part in a health-care fraud scheme.[6]

---

[4] In his 2000 application for asylum, Herrow alleged false facts. He claimed that the smuggler who brought him to the United States "told him that he would 'get farther' if he adopted the narrative his smuggler wrote out for him [and the smuggler] insisted that this was the only way for [Herrow] to obtain asylum." CAR 78.

[5] CAR 229.

[6] As part of a scheme to bill insurance companies for services, a chiropractic medical office, for which Herrow was already working as a driver, paid him between $100 to $200 for bringing in individuals involved in car accidents. Herrow

4

The court sentenced Herrow to twelve months and one day incarceration.

In 2019, the U.S. Department of Homeland Security issued Herrow a Notice to Appear, charging him with removal under § 237(a)(2)(A)(iii) of the Immigration and Nationality Act (INA) due to his conviction.

*ii. Herrow's I-28, I-485, I-605, I-589, and Accompanying Evidence*

To obtain relief from removal, Herrow submitted a Form I-485 (Application to Register Permanent Residence or Adjust Status), a Form I-602 (Application by Refugee for Waiver of Grounds of Excludability), and a Form I-589 (Application for Asylum, Withholding of Removal, and Relief under CAT).

In his brief in support of his submissions, Herrow asserted a fear of persecution and torture in Somalia due to his membership in five separate particular social groups, including "Repatriated Minority Somalis."[7]  He also claimed that the Somali government and Al Shabaab will subject him to torture because of his "westernization"; his extended time abroad; the suspicion that he is a Western spy; his minority status as a Bantu; his lack of clan ties; the perception that he could pay ransom; and his refusal to adhere to Al Shabaab's rigid and extreme views of Islam.[8]  In his submissions, he also pointed

---

referred approximately 19 patients to the clinic, making around $2,000 in total as a "runner."  CAR 267.

[7] CAR 275.

[8] CAR 278.

to the government's acquiescence in Al Shabaab's conduct.

With his brief, Herrow submitted a wide range of evidence: The U.S. Department of State's 2019 Human Rights Report on Somalia; Human Rights Watch's 2020 Somalia report; Amnesty International's 2019 Somalia report; and the Canadian Government Report on Somalia. Herrow also attached a Georgetown Immigration Law Journal article surveying the experience of twenty Somali Bantus (the Somali minority to which Herrow and other Reer Hamar belong) who were deported and returned to Somalia between 2016 and 2018 (the Georgetown Article). In addition, Herrow included two declarations from a 2017 case concerning deportees in Somalia, as well as numerous articles highlighting clan relationships and status, Al Shabaab and its treatment of returnees, and acquiescence and instability in the government and police forces.

*iii. May 2020 Merits Hearing*

In May 2020, the Immigration Judge (IJ) held a merits hearing. Herrow withdrew his I-485 and I-602 applications and proceeded on only his I-589 (Application for Asylum, Withholding of Removal, and Relief under CAT).

Herrow testified that if he were to go back to Somalia, Al Shabaab would target him due to his membership in a particular social group, his life in the United States, and his status as a repatriated minority Somali. In Herrow's words, Al Shabaab has "infiltrated every part of the government. They're at the airport. They are, you know, everywhere. And [if] they

find me, they will kill me."[9] He believes he would be targeted because he is perceived as a U.S. spy and his culture has changed. He testified that "it's not if, it's when they'll cut me into pieces."[10] He explained that people who have previously returned have been killed or jailed. He testified that Al Shabaab has infiltrated the police and government, so there is nowhere to go. Al Shabaab is in the government and works with the government. They have an agenda and they "assassinate ministers and anybody they want . . . , put[ting] bombs on the street and kill[ing] people that way."[11]

*iv. Decision of the Immigration Judge*

The Immigration Judge (IJ) terminated Herrow's asylum status and denied his applications for relief, ordering him removed to Somalia. The IJ found Herrow credible. However, because of his criminal conviction and because his original asylum petition recited false facts, the IJ terminated his asylee status. Due to his conviction, the IJ denied his new application for asylum.

The IJ also denied Herrow's application for withholding of removal under INA § 241(b)(3). First, the IJ found that, of Herrow's proposed groups, only the "Reer Hamar or Bandabow clan/tribe" constitutes a particular social group.[12] Second, the IJ found that the record did not support a clear probability of future persecution of Herrow based on his

---

[9] CAR 213–14.
[10] CAR 233.
[11] CAR 232.
[12] CAR 129.

membership in this group.[13]  Finally, the IJ rejected Herrow's contention that the government of Somalia is unwilling or unable to protect him from the persecution he fears upon return to Somalia.

Turning to CAT, the IJ rejected Herrow's application for protection.  The IJ concluded that Herrow is not likely to face torture beyond the risk common to all returnees.

*v. Appeal to the Board of Immigration Appeals*

Herrow appealed the IJ's decision.  With regard to withholding of removal, Herrow made three arguments:  first, that the IJ erred in finding that "Minority Somalis," "Minority Somalis who lack clan and/or family ties," and "Repatriated Minority Somalis" are not cognizable social groups;[14] second, that the IJ erred in finding that the evidence does not show that he would be subject to a pattern or practice of persecution if he returned to Somalia; third, that the IJ erred in finding that the "record does not reflect that the government of Somalia is unwilling or unable to protect [Herrow] from the persecution he fears."[15]

With regard to CAT, Herrow made several arguments: first, that the IJ erred in failing to apply the legal standard we set out in *Myrie v. Attorney General*;[16] second, that the IJ applied the wrong standard in determining whether Herrow would be tortured if he returned to Somalia; finally, that the IJ

[13] CAR 131.
[14] CAR 72.
[15] CAR 73.
[16] 855 F.3d 509 (3d Cir. 2017).

8

did not consider all of the evidence in the aggregate in making its determination.

The BIA dismissed Herrow's appeal, ordering his removal to Somalia. As is relevant here, the BIA agreed with the IJ's determination that "Repatriated Minority Somalis" is not a cognizable particular social group because the terms "minority" and "repatriated minority" are "too amorphous, overbroad, and diffuse."[17] Further, the BIA, in applying *Myrie* and citing to the IJ's opinion, found that Herrow failed to allege a sufficient likelihood of harm or to assert whether the harm amounted to torture and whether the government of Somalia would acquiesce in that torture.

Herrow now petitions for our review of three issues: (1) whether the BIA erred in finding that "Repatriated Minority Somalis" is not a cognizable social group; (2) whether the BIA erred in finding that Herrow was not likely to face torture in Somalia; and (3) whether the IJ erred in finding that the Somali government would not acquiesce in torture.[18]

## II. JURISDICTION AND STANDARD OF REVIEW

The BIA had jurisdiction under 8 C.F.R. § 1003.1(b)(3). We have jurisdiction under 8 U.S.C. § 1252(a).[19]

---

[17] CAR 12–13.

[18] Petitioner Br. 1–2.

[19] The government submitted a letter pursuant to Federal Rules of Appellate Procedure Rule 28(j) acknowledging our jurisdiction under § 1252(a).

Where the BIA affirms the decision of the IJ and "set[s] forth somewhat its own rationale and analysis," we review both the BIA's and the IJ's decisions.[20]  However, "[i]f the Board relies only on some of the grounds given for denying relief, we review only th[ose] grounds."[21]  We review the BIA's affirmance of an IJ's factual findings under a substantial evidence standard.[22]  In essence, "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."[23]  We review the IJ's and BIA's legal determinations, including mixed questions of law and fact, de novo.[24]

## III.   DISCUSSION

## A. Convention Against Torture

Herrow claims that the BIA and IJ erred in denying his CAT claim and in finding that (1) he is unlikely to face torture and (2) the Somali government would not acquiesce in such torture.  Because the BIA and IJ ignored evidence favorable to Herrow, we will grant his petition in part and remand for a more comprehensive review of the evidence.

---

[20] *Leia v. Ashcroft*, 393 F.3d 427, 433 n.5 (3d Cir. 2005); *Myrie*, 855 F.3d at 515.

[21] *Myrie*, 855 F.3d at 515 (citing *Chukwu v. Att'y Gen.*, 484 F.3d 185, 193 (3d Cir. 2007)).

[22] *Tarrawally v. Ashcroft*, 338 F.3d 180, 184, 186 (3d Cir. 2003); *Myrie*, 855 F.3d at 516–17.

[23] INA § 242(b)(4)(B), *codified at* 8 U.S.C. § 1252 (b)(4)(b).

[24] *Arreaga Bravo v. Att'y Gen.*, 27 F. 4th 182, 185 (3d Cir. 2022); *Myrie*, 855 F.3d at 516–17; *Matter of Cabrera*, 24 I. & N. Dec. 459, 460 (BIA 2008).

The CAT provides that "[n]o State Party shall expel, return . . . or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."[25] CAT became binding on the United States in 1994, at which time it became "the policy of the United States not to expel . . . or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture . . . ."[26] The burden of proving the likelihood of torture is on the applicant.[27] If the applicant satisfies that burden, "withholding of removal or deferring of removal [under CAT] is mandatory."[28]

An act constitutes torture if it is:

(1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for an illicit or proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from

---

[25] Art. 3(1), S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 85.

[26] *Silva–Rengifo v. Att'y Gen.*, 473 F.3d 58, 64 (3d Cir. 2007) (quoting Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105–277, div. G., tit. XXII, § 2242, 112 Stat. 2681–822 (codified at 8 U.S.C. § 1231)); U.N. Doc. 571 Leg/SER.E/13.IV.9 (1995).

[27] 8 C.F.R. § 208.16(c)(2).

[28] *Silva–Rengifo*, 473 F.3d at 64 (citing 8 C.F.R. §§ 1208.16–18).

lawful sanctions.[29]

Herrow contends that the IJ and BIA erred because they improperly ignored evidence that would lead a rational factfinder to conclude that he is likely to face torture and that the Somali government would acquiesce in that torture. We agree. As is clear under our existing law, the IJ and the BIA "may not ignore evidence favorable to the [noncitizen]."[30]

*i. Likelihood of Torture*

To establish a likelihood of future torture, the record must demonstrate an aggregate risk of torture to the noncitizen that exceeds fifty percent.[31] In making this determination, the IJ must address what is likely to happen to the petitioner if removed,[32] and whether "what is likely to happen amount[s] to the legal definition of torture."[33] In answering these questions

---

[29] *Myrie*, 855 F.3d at 515 (quoting *Auguste v. Ridge*, 395 F.3d 123, 151 (3d Cir. 2005)). Herrow need not, however, "establish that torture is inflicted 'on account of' any protected status." *Silva-Rengifo*, 473 F.3d at 64. In essence, Herrow "must establish a likelihood of being subjected to torturous acts inflicted "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Id.* (quoting 8 C.F.R. § 1208.18(a)(1)).

[30] *Huang v. Att'y Gen.*, 620 F.3d 372, 388 (3d Cir. 2010) (citing *Espinosa-Cortez v. Att'y Gen.*, 607 F.3d 101, 107 (3d Cir. 2010)); *Quinteros v. Att'y Gen.*, 945 F.3d 772, 786 (3d Cir. 2019).

[31] *Kamara v. Att'y Gen.*, 420 F.3d 202, 213–14 (3d Cir. 2005).

[32] *Id.*

[33] *Myrie*, 855 F.3d at 515.

here, the BIA and IJ found that Herrow did not demonstrate a likelihood of torture. We conclude, however, that this determination could not have been made if all the evidence presented by Herrow had been properly considered.

The government contends that we should deny Herrow's petition under *Hernandez Garmendia v. Attorney General*, 28 F.4th 476, 484 (3d Cir. 2022), which requires that a petitioner put forth evidence that he is likely to be singled out and tortured.[34] We correctly denied Hernandez Garmendia's petition under this standard because there was no evidence in the record to suggest that Hernandez Garmendia would be singled out and tortured. Here, however, Herrow provided ample support for his claim that he will be singled out and tortured if he returns to Somalia due to his status as a returnee from the United States and as a member of a minority clan.

For example, the IJ concluded that even though "Al-Shabaab operatives have condemned returnees from Western countries as 'infidels' and threatened to retaliate, and even to kill, those suspected of spying," Herrow "was unable, especially in light of his twenty-eight-year absence from the country, to provide any reason for why he would be singled out for torture."[35] It is exactly that twenty-eight-year absence, however, that supports his being singled out. The IJ ignored extensive evidence in the record, including reports and declarations of experts, that returnees from the United States are easily identifiable as "American" because of clothing, learned gestures, weight, lighter skin color, and accent. The IJ did not engage with this evidence. In fact, the IJ found Herrow

---

[34] Dkt. 33 at 13:21–25.
[35] CAR 102.

13

credible but ignored his assertions that Al Shabaab would target him due to his shaved head, size, cultural differences, and tribe. The evidence demonstrates that returnees like Herrow are "considered inherently suspect" and "targeted for violence and death on this basis."[36]

The IJ also failed to engage with other evidence in the administrative record demonstrating a likelihood of torture to Herrow. For example, the IJ makes no reference to the Georgetown Article, in which the author surveyed the twenty Somali Bantus deported and returned to Somalia between 2016 and 2018. Of these, fifty-five percent reported being tortured upon their return. In fact, of those returned in 2018, 66.7 percent were tortured. Based on Herrow's identifiable traits and the statistics garnered in the Georgetown Article, the evidence does not support the IJ and the BIA's conclusion that Herrow "could not articulate why [Al Shabaab] would target him specifically, aside from happenstance."[37]

The IJ asserts that Herrow can mitigate his risk of torture by relocating to a major urban center, like Mogadishu. This finding is contrary to the evidence in the record.[38] As an initial matter, the record suggests relocation is difficult, and

---

[36] CAR 312.

[37] CAR 135.

[38] Herrow rightfully notes that "diminished risk is not the standard under which we determine the likelihood of torture." Dkt. 33 at 25:6–19. Even if Herrow could diminish his risk of torture by moving to Mogadishu—a claim that finds minimal support in the record—the BIA and IJ provide no support from the record to suggest that the risk would diminish to the extent that Herrow's risk of torture is less than 50 percent.

relocation itself can open individuals up to violence and torture. The U.S. Department of State's Somalia report states that "[c]heckpoints operated by government forces, allied groups, armed militias, clan factors, and al-Shabaab inhibit[] movement and expose[] citizens to looting, extortion, harassment, and violence."[39] The airport provides no better means of relocating. The Georgetown Article notes that "35 percent [of the surveyed individuals] could not even leave the Mogadishu International Airport without being detained."[40] Ninety percent of those surveyed experienced some form of abuse, torture, interrogation, or extortion at the airport.

The IJ suggests that Herrow would be safe in Mogadishu or another city due to the rise in status of his clan, the Reer Hamar. However, the IJ cherry picks facts from the record. While one report notes that some Benadiri and Reer Hamar have acquired positions in the government, most positions are in local and regional governments. A different report posits that this representation is minimal and "token."[41] In fact, there is evidence that only a few thousand Benadiri and Reer Hamar remain in Somalia at this point, with even fewer in Mogadishu—to the point where the clan has "almost ceased to exist."[42] They are forced to pay another clan or private militia for protection or gain protection through the marriage

---

[39] CAR 398.

[40] CAR 512

[41] CAR 532.

[42] CAR 576 ("The minorities' areas are ghost towns and it is unknown how many minority group members remain in Mogadishu."); CAR 576 ("90% of the Rer [sic] Hamar population in Mogadishu have left the city as a consequence of civil war and lack of security for this group.").

of their daughters to stronger clans.[43]  This level of protection is not afforded to all clan members; those who lack marriageable daughters or the funds to afford protection are out of luck.  After a twenty-eight-year absence, Herrow, like all those "who have been in the United States for years or decades lack[s] any meaningful clan or social networks that are crucial to maintain what safety can be had in Somalia."[44]

Additional evidence also conflicts with the IJ's finding that Herrow can mitigate his risk in Mogadishu due to greater government and police presence.  Al Shabaab "maintains a presence in Mogadishu and is able to attack . . . buildings . . . and other targets almost at will. . . . It carried out at least 33 car bombings in Mogadishu from January to November 2017."[45]  Herrow points to a number of other attacks in Mogadishu, including one by a political aide inside the Mogadishu mayor's office that led to the mayor's death.[46]  The evidence repeatedly notes that Al Shabaab has significant technical and intelligence capabilities and has infiltrated government and securities institutions throughout Somalia, including Mogadishu.

Finally, in addition to issues within the airport itself, the

---

[43] CAR 192 ("for the [Reer Hamar] 'protection' has meant forced payment of bribes and being subjected to extortion by majority clans' armed and lawless militias, as a means of raising illegal revenue—and is more accurately akin to 'protection rackets' . . . it is axiomatic, therefore, that a person must be from a dominant clan to be able to access this kind of protection.").

[44] CAR 359.

[45] CAR 352.

[46] In fact, two of Herrow's siblings were killed in explosions in Mogadishu.

Georgetown Article found that twenty percent of those surveyed were kidnapped and tortured outside the airport before being able to enter Mogadishu. Further, all of those surveyed stated "that they were orally or physically abused, detained for more than four hours, forced to pay a bribe, interrogated, kidnapped, tortured, or forced to pay ransom" while in Mogadishu.[47] In the City of Kismayu, 66.7 percent of those surveyed were treated similarly. The IJ engages with none of this evidence, which taken as a whole cannot support the conclusion that Herrow "may be able to mitigate some of his risk by locating to a major urban center."[48]

While the IJ noted that it considered all the evidence, none of the above is specifically mentioned. The IJ need not address every piece of evidence in the administrative record, but it cannot ignore evidence favorable to Herrow.[49] Because the IJ does ignore such evidence, we grant Herrow's petition for review and remand this case to the BIA for reconsideration of all evidence before it.

*ii.* *Acquiescence to Torture*

Herrow also challenges the IJ's conclusion that the evidence does not support a finding that the Somali government would acquiesce to torture.[50]

---

[47] CAR 499.

[48] *See* CAR 102.

[49] *Huang*, 620 F.3d at 388.

[50] Because the BIA did not reach the issue of acquiescence, we review the IJ's findings. *See* CAR 5 ("Because we uphold this finding [that there is no likelihood of torture], we need not address whether the government would acquiesce in

17

"Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity."[51] In assessing acquiescence, the IJ must ask "how public officials will likely act in response to the harm the petitioner fears" and "whether the likely response from public officials qualifies as acquiescence."[52] An individual can establish acquiescence by showing that a public official was actually aware of torture or willfully blind to the torture.[53] "[T]he question of whether likely government conduct equates to acquiescence is a mixed question of law and fact . . .."[54]

Again the IJ's conclusion that the government's conduct would not amount to acquiescence was based on cherry picked record evidence. The IJ ignored ample evidence favorable to Herrow that is contrary to its findings. First, the IJ states that the government would not acquiesce because Reer Hamar has gained political status and position in the government. The IJ explains that because of this gained power, "it is unlikely that

---

[Herrow's] torture.").

[51] 8 C.F.R. § 1208.18(a)(7).

[52] *Myrie*, 855 F.3d at 516. The first question is reviewed for clear error, while the second question is reviewed de novo. *Id.* at 516–17; *Arreaga Bravo*, 27 F. 4th at 185.

[53] *Myrie*, 855 F.3d at 516; *Silva-Rengifo*, 473 F.3d at 65 ("The CAT does not require an alien to prove that the government in question approves of torture, or that it consents to it. Rather . . . an alien can satisfy the burden established for CAT relief by producing sufficient evidence that the government in question is willfully blind to such activities.").

[54] *Myrie*, 855 F.3d at 516.

the government would condone the targeting of one of its members."[55]    As discussed above, that overstates Reer Hamar's status and position in the government.  It remains a small community with limited power.  And most security forces are closely identified with a majority clan that likely has no incentive to protect Herrow.[56]  A 2017 U.S. Department of State Human Rights Report on Somalia aptly describes the implications of this situation, explaining that "[m]inority groups, often lacking armed militias, continued to be disproportionately subjected to killings, torture, rape, kidnapping for ransom, and looting of land and property with impunity by faction militias and majority clan members, *often with the acquiescence of federal and local authorities*."[57]

Second, our case law is contrary to the IJ's finding that because the Somali government is engaged in an active internal conflict against Al Shabaab, it has not acquiesced in their torture.  We have held that such facts do not preclude a showing that a government was willfully blind because "[a]n applicant can establish governmental acquiescence even if the government opposes the [] organization that is engaged in torturous acts."[58]

---

[55] CAR 103.

[56] *See* CAR 564 ("To the extent that the population turns to the police for assistance, they turn . . . to police officers from the same clan.  Other sources also emphasize that the loyalty of the police and other members of the government forces normally rests with their own clan.").

[57] CAR 486, 495, 552 (emphasis added) (quoted throughout record).

[58] *Myrie*, 855 F.3d at 518 (quoting *Pieschacon-Villegas v. Att'y Gen.*, 671 F.3d 303, 312 (3d Cir. 2011)) (second

Third, the IJ ignores evidence suggesting the Somali government's own participation and acquiescence in the torture of minority returnees. For example, the IJ never engages with the fact that "[m]ost instances of detention, kidnapping, and torture [of the Bantu deportees surveyed in the Georgetown Article] were carried out by one or more uniformed Somali government security personnel."[59] In fact, ninety percent of those surveyed "experienced oral or physical abuse, detention for more than one hour, forcible payment of a

---

alteration in original); *see also id.* at 516 ("Circumstantial evidence may establish acquiescence to targeted acts of violence even when the government has an official policy or is engaged in a campaign of opposition against the entity the applicant fears.").

[59] CAR 518; *see also* CAR 486 ("Survey results from the Somali Bantu deportees reveal that most were kidnaped and tortured for ransom by uniformed Somali police or armed groups that the Somali Government was unwilling or unable to control. Some were kidnapped and tortured for ransom upon arrival at the Mogadishu International Airport (MIA) by Somali government security personnel . . . ."); CAR 518 ("Of the seven instances at MIA, uniformed Somali government security personnel were responsible for 57.1 percent of abductions. Of the 4 instances in Mogadishu, uniformed Somali government security personnel were responsible for 75 percent of the abductions and torture. Of the two instances in Kismayu, uniformed Somali government security personnel were responsible for one of the abductions and torture." (citations omitted)); CAR 500 ("Of the eight Somali Bantu deportees who were abused in the City of Kismayu, 50 percent identified their abusers as the Jubbaland State police and 50 percent as Al Shabaab.").

bribe, interrogation, torture, or forcible payment of a ransom by uniformed Somali security personnel stationed at the airport."[60] To the extent that individuals involved are plain-clothed and impersonating customs officials, the article authors suggest that they are "doing so with the consent of actual public officials," "evident from the fact that these plain-clothed individuals are able to detain Somali Bantu deportees in the airport, a government-controlled facility."[61] Additionally, a Canadian Government report suggests that, while authorities have used military courts where security forces abused civilians, "they generally did not investigate abuse by police, army, or militia members" and "a culture of impunity was widespread."[62]

Fourth, the IJ ignores evidence that members of Al Shabaab constitute the government, instead treating them as separate entities. The IJ's conclusion that members of Al Shabaab are rogue operatives attempting to sabotage the government and that their actions are not that of the government itself is unsupported by case law. In 2020, the U.S. Attorney General (AG) rejected the contention that misuse of government authority or extrajudicial acts do not qualify as government action.[63] Instead, the AG explained that "[i]t is misuse of authority, 'made possible only because the wrongdoer is clothed with the authority' . . . of law, that may violate the CAT regulations."[64] Similarly, we agree with the

---

[60] CAR 499.

[61] CAR 518.

[62] CAR 564.

[63] *Matter of O-F-A-S-*, 28 I. & N. Dec. 35, 41 (2020).

[64] *Id.* (citing *West v. Atkins*, 487 U.S. 42, 49 (1988)); *see also id.* ("By immunizing extrajudicial action by low-level officials

21

Fifth Circuit that:

> [P]roving action in an officer's official capacity "does not require that the public official be executing official state policy or that the public official be the nation's president or some other official at the upper echelons of power. Rather . . . the use of official authority by low-level officials, such a[s] police officers, can work to place actions under the color of law even where they are without state sanction."[65]

The IJ's conclusion is unsupported by the evidence. In many regions of Somalia, Al Shabaab fully governs.

---

from the CAT's scope, a freestanding 'rogue official' rule would appear to disqualify much of what the 'under color of law' rule might otherwise qualify as 'torture.'"). To the extent that rogue officials do act for purely private reasons, the Second Circuit has suggested that the fact that torture is "routine" and tied to other criminal justice system objectives can demonstrate knowledge by officials or willful blindness. CAR 516 (citing *Khouzam v. Ashcroft*, 361 F.3d 161, 171 (2d Cir. 2004)). However, the court noted that "when it is a public official who inflicts severe pain or suffering, it is only in exceptional cases that we can expect to be able to conclude that the acts do not constitute torture by reason of the official acting for purely private reasons." CAR 516–17 (quoting *Khouzam*, 361 F.3d at 171).

[65] *Marmorato v. Holder*, 376 F. App'x. 380, 385 (5th Cir. 2010) (alterations in original) (quoting *Ramirez-Peyro v. Holder*, 574 F.3d 893, 901 (8th Cir. 2009)); CAR 516 (quoting *Marmorato*, 376 F. App'x at 385).

Meanwhile, in areas run by the Somali government, Al Shabaab has infiltrated all levels of the government and security forces. Herrow himself asserts that "they're the most powerful in the government."[66] As at least one declaration in the record notes, "an individual can be a policeman by day and an Al Shabaab operative by night."[67] The record demonstrates Al Shabaab's use of government authority in abducting, torturing, and attacking civilians, including returnees to Somalia. It is through its members' roles in the government that Al Shabaab can target and keep track of people. It is with the authority of law, working as Somali security personnel stationed at the airport, that Al Shabaab is able to kidnap, abduct, and torture returnees. They can locate individuals and take action because Al Shabaab "exists right at the heart of federal government and is 'present during cabinet meetings.'"[68]

Based on ample evidence in the record that the IJ failed to consider and that contradicts the IJ's findings on acquiescence, we will grant Herrow's petition with respect to his claim that the BIA ignored favorable evidence, remanding to the BIA for consideration of all the evidence under the appropriate legal standards.

## B. Withholding of Removal

Herrow claims that the BIA and IJ erred in denying his withholding of removal claim based on his membership in the

---

[66] CAR 231.
[67] CAR 353.
[68] CAR 311 (emphasis omitted).

"Repatriated Minority Somalis" group.[69] Because we agree with the BIA and IJ that "Repatriated Minority Somalis" is not a cognizable particular social group, we will deny Herrow's petition in part.

A person is not subject to removal and is granted withholding of removal if his "life or freedom would be threatened in that country because of [his] race, religion, nationality, membership in a particular social group, or political opinion."[70] To establish membership in a particular social group, a person must show that the group is "(1) composed of members who share a common, immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question."[71]

A characteristic is immutable if it cannot be changed or should not "be required to [be] change[d] as a matter of conscience to avoid persecution."[72] "A group is particularized if it is discrete, has definable boundaries—as opposed to being overbroad, diffuse, or subjective . . . ."[73] A group's size, however, does not preclude it from being cognizable under the

---

[69] The determination of whether a group constitutes a cognizable social group is reviewed de novo. *Matter of W-Y-C- & H-O-B-*, 27 I. & N. Dec. 189, 191 (BIA 2018).

[70] 8 U.S.C. § 1231(b)(3).

[71] *Radiowala v. Att'y Gen.*, 930 F.3d 577, 583 (3d Cir. 2019) (citing *S.E.R.L. v. Att'y Gen.*, 894 F.3d 535, 540 (3d Cir. 2018)); *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 237 (BIA 2014).

[72] *Radiowala*, 930 F.3d at 583.

[73] *Id.*

24

INA.[74]  That said, there must be a clear "benchmark for determining who falls within" the group.[75]  To be socially distinct, there must be "evidence that the society in question recognizes a proposed group as distinct."[76]

Here, the BIA held that "Repatriated Minority Somalis" is not a cognizable social group because the term "repatriated minority" is "too amorphous, overbroad, and diffuse to satisfy the particularity requirement."[77]  In doing so, it agreed with the IJ that "minority" can encompass any "relatively small group of people in Somalia" and is neither "limited to one's clan membership" nor "narrowed by any other criterion."[78]  We agree with the IJ's assessment.

Herrow argues that his proposed group is no more amorphous than other groups courts have recognized, such as "Somali females" or "Iranian women."[79]  He is mistaken.  All members of those groups share a commonality:  they are women.  Meanwhile, as the IJ correctly noted, "minority" can encompass persons belonging to "tribal, ethnic, religious,

---

[74] *N.L.A. v. Holder*, 744 F.3d 425, 438 (7th Cir. 2014) ("[I]t would be antithetical to asylum law to deny refuge to a group of persecuted individuals who have valid claims merely because too many have valid claims."); *see also Singh v. I.N.S.*, 94 F.3d 1353, 1359 (9th Cir. 1996) ("[W]e reject the notion that an applicant is ineligible for asylum merely because all members of a persecuted group might be eligible for asylum.").
[75] *Radiowala*, 930 F.3d at 583.
[76] *Id.* (quoting *S.E.R.L.*, 894 F.3d at 551).
[77] CAR 3.
[78] CAR 12.
[79] Petitioner Br. 23–24.

cultural, political, and other minorities."[80] While being part of a minority may be immutable, society may not recognize a group encompassing all members of all minorities in Somalia as socially distinct.

The term "repatriated" is similarly overbroad, as it can encompass individuals absent for days or decades. While evidence in the record demonstrates that a returnee who has been absent from Somalia for years may be distinguishable, there is no evidence that a returnee absent for a few weeks or months might be. Thus, we agree that, as framed, this group is "insufficiently socially distinct" as well.[81] Therefore, we reject Herrow's argument that "Repatriated Minority Somalis" are a cognizable social group and deny Herrow's petition for review of his withholding of removal claim.

## IV.    CONCLUSION

We will grant in part Herrow's petition for review and remand this case to the BIA for consideration of all evidence, including that evidence which is favorable to Herrow, on his CAT claim. For the reasons stated above, we will affirm the dismissal of the remaining claims.

---

[80] CAR 96.
[81] CAR 97.

*Herrow v. Attorney General*, No. 22-1854
PHIPPS, *Circuit Judge*, dissenting in part.

The Majority sets aside the final order of removal and remands this case to the agency on the grounds that the agency failed to consider evidence favorable to Herrow's CAT claim. While I agree with the other holding in the case (that repatriated minority Somalis do not constitute a cognizable particular social group), I respectfully disagree with the conclusion that the CAT claim merits reconsideration by the agency.

From a casual reading of the Majority Opinion – one unaccompanied by the administrative record – one could leave with the impression that the agency ignored an almanac of facts regarding the torture of repatriated Somalis. That takeaway would be inaccurate because the facts that the agency did not specifically address come from a single source: an article published in the Georgetown Immigration Law Journal. *See* Daniel J. Van Lehman & Estelle M. McKee, *Removals to Somalia in Light of the Convention Against Torture: Recent Evidence from Somali Bantu Deportees*, 33 Geo. Immigr. L.J. 357 (2019) (AR484–524). And there was readily apparent good cause for not crediting those facts.

The article itself lacks many of the traditional indicia of reliability. Nothing in the administrative record indicates that the journal is peer-reviewed; rather, it appears to be a student-run journal. Moreover, the article itself is an advocacy piece. Its two authors are paid to advocate for refugees – one leads a law school immigration clinic and the other testifies as an expert at removal hearings. *See id.* at 357 n.* (AR484) (stating that one author "teaches the Asylum and Convention Against Torture Appellate Clinic" at Cornell Law School, and that the other "has testified as an expert witness in criminal and immigration court for Somali minorities, including the Somali Bantu"). In addition, the article expressly announces its purpose of demonstrating that "current United States law does

not properly consider the reality of torture and persecution suffered by the Somali Bantu." *Id.* at 360 (AR487). And lest its character as an advocacy piece be overlooked, the article closes with an appendix containing an open letter addressed to the United Nations High Commissioner for Refugees urging that Somali Bantus be "not returned to Somalia against their will." *Id.* at 396 (AR523).

The article's methodology further undercuts its reliability. The article makes broad conclusions about the conditions in a country of over 20 million people based on interviews of 18 Somalis. That sample size is not only statistically insignificant, but also the methodology is subjective (since it bakes in the biases of the participants) and does not lend itself to independent verification (since it neither includes a list of interview questions nor offers to make available the responses). Moreover, the article suffers from selection bias because a criterion for inviting the participants was the ease of contacting them, and the article does nothing to rule out the possibility that the participants may have been former clients of the clinic administered by one of the authors or persons in whose favor the other author testified.

Finally, even on its own terms, the article is not reliable. The demographic data it provides about the participants indicates that they have differences in birth country, native language, clan and subclan membership, and religious practice. Yet the article makes no effort to determine the role that those other variables may have on the likelihood of torture in Somalia. Without any attempt at a multivariate analysis, the article does nothing to rule out another variable or combination of variables as the cause for the experiences reported by the participants.

In light of the patent concerns about the article's reliability, it is inappropriate, in my view, to set aside the removal order based on the agency's failure to explain its decision not to credit the findings in the article. While an agency has an

2

obligation to consider the whole record, including evidence that detracts from its position, *see Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488–89 (1951), an agency need not explain its decision not to credit evidence that has minimal persuasive value, *see Huang v. Att'y Gen.*, 620 F.3d 372, 388 (3d Cir. 2010).  Here, the obvious reliability concerns with the article make it unnecessary for the agency to specifically explain why it was not persuaded by the article's factual findings.  And even if the agency did have to explain why it gave no meaningful weight to the article's fact-finding, the omission of that explanation would be nothing more than harmless error since, even if considered, the article would not compel a reasonable adjudicator to reach a contrary conclusion.  *See* 8 U.S.C. § 1252(b)(4)(B); *Garland v. Ming Dai*, 593 U.S. 357, 373 (2021) ("[T]he court of appeals must accept the agency's findings of fact as 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" (quoting 8 U.S.C. § 1252(b)(4)(B))).

For these reasons, I respectfully dissent in part, and I would deny the petition.

3